S10P1859. LEDFORD v. THE STATE.

(709 SE2d 239)

CARLEY, Presiding Justice.

A jury found Michael William Ledford guilty of the murder of Jennifer Ewing and related offenses. After finding multiple statutory aggravating circumstances, the jury recommended a death sentence for the murder. See OCGA § 17-10-30 (b). The trial court entered judgments of conviction on the guilty verdicts and sentenced Ledford to death for murder and to various consecutive terms of imprisonment for the remaining crimes. Ledford appeals after the denial of a motion for new trial.* For the reasons set forth below, we vacate

---

* Ledford committed the crimes on July 25, 2006. He was originally indicted by a Paulding County grand jury on September 28, 2006. On October 26, 2006, he was re-indicted on the same charges, which were one count of malice murder, two counts of felony murder, three counts of aggravated battery, one count of aggravated sodomy, two counts of kidnapping with bodily injury, and one count of aggravated assault. On November 3, 2006, the State filed written notice of its intent to seek the death penalty. Jury selection began on April 13, 2009. On May 18, 2009, the jury found Ledford guilty of all counts and, on May 22, 2009, recommended a death sentence for the murder. On that same day, the trial court entered the judgments, imposed a death sentence for the malice murder, and properly treated the felony murder convictions as mere surplusage. See *Malcolm v. State,* 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993); OCGA § 16-1-7 (a). The trial court also imposed the following terms of imprisonment, each to be consecutive to one another and to the death sentence: 20 years for each of the three aggravated batteries; life without parole for the aggravated sodomy; life without parole for the first count of kidnapping with bodily injury; and 20 years for the aggravated assault. See OCGA § 17-10-7 (b) (2) (providing for the sentencing of repeat offenders). The trial court properly treated the conviction on the second count of kidnapping with bodily injury as mere surplusage. Id. Ledford filed a motion for new trial on June 10, 2009, which he amended on September 30, 2009, and which the trial court denied on May 25, 2010. After obtaining a 30-day extension for filing, Ledford filed a notice of appeal on July 23, 2010. This appeal was docketed on July 27, 2010, for the September 2010 term of this Court, and the

Ledford's convictions and sentences for aggravated battery, but affirm all remaining convictions and sentences, including his death sentence for the murder.

1. The evidence presented at trial showed that, on July 25, 2006, Michael Ledford pretended to go to work but, instead, bought beer and drank it near the Silver Comet Trail, a recreational trail used for biking, running, and other activities. Ledford knocked Jennifer Ewing from her bicycle as she rode by his location. He dragged her a distance off the trail to a location shielded from view by vegetation. He stripped off all of her clothing from the waist down, and he pulled her shirt up part way, exposing her breasts. She suffered bruises throughout her body in the struggle. When Ledford forced his penis into her mouth, she bit his penis and severely wounded it. Enraged by her resistance, Ledford unleashed a shocking attack during which he stomped on her face and nose, her larynx, and her ribs. Ms. Ewing gradually succumbed to asphyxiation caused by her wounds and the resulting bleeding into her lungs.

Upon our review of the record, we conclude that the evidence presented at trial was sufficient to authorize a rational trier of fact to find Ledford guilty beyond a reasonable doubt on all charges. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). However, we recognize that the victim's death was caused by the same actions which established the commission of the three aggravated batteries. Thus, we will determine whether the aggravated batteries should merge either into each other or into the malice murder.

We will first address the question of whether the aggravated batteries must be merged into each other. "Georgia law prohibits multiple convictions if '(o)ne crime is included in the other.' OCGA § 16-1-7 (a) (1)." *Goss v. State*, 289 Ga. App. 734, 738 (3) (658 SE2d 168) (2008). Under the express terms of that statute, however, "[t]he rule prohibiting more than one conviction if one crime is included in the other does not apply unless 'the same conduct' of the accused establishes the commission of multiple crimes." *Waits v. State*, 282 Ga. 1, 4 (2) (644 SE2d 127) (2007). In this case, the first count of aggravated battery required the State to prove that Ledford seriously disfigured the victim's head and face, the second count required proof that he rendered her larynx useless, and the third count required proof that he deprived her of her lung. See OCGA § 16-5-24 (a). "Each count thus was predicated on different conduct by [Ledford]." *Goss v. State*, supra at 739 (3) (b). Moreover, the testimony of a pathologist shows that each of these injuries was

---

case was orally argued on January 24, 2011.

caused by separate blows to the victim's body. Therefore, each aggravated battery verdict is attributable to different conduct than the other aggravated battery verdicts. See *Waits v. State*, supra. Accordingly, the doctrine of merger does not apply, and separate convictions for each count of aggravated battery clearly are appropriate unless they merge into the murder conviction. *Waits v. State*, supra; *Goss v. State*, supra. Compare *Gonzales v. State*, 298 Ga. App. 821, 824 (1) (681 SE2d 248) (2009) (error in sentencing defendant on two aggravated battery counts based on the single unlawful act against the same victim of pushing her out of a moving car). We note that the same holding on similar facts is found in *Nealey v. State*, 285 Ga. App. 334, 335-336 (1) (646 SE2d 471) (2007), but that decision must be overruled because it erroneously skipped the "same conduct" analysis and unnecessarily examined whether one aggravated battery was included in another by utilizing the "actual evidence" test, which was rejected in *Drinkard v. Walker*, 281 Ga. 211 (636 SE2d 530) (2006).

We next address whether any of the aggravated battery counts must be merged into the murder count. The evidence showed that each of the three aggravated batteries contributed to the death of the victim by asphyxiation and, thus, the "same conduct" established the commission of both malice murder and the aggravated battery counts. However, merger of any aggravated battery count into the murder count

> is not required on this basis. If the same conduct established the commission of both offenses, it is [generally] necessary to take the next step in the analysis by applying the "required evidence" test[, as adopted in *Drinkard* pursuant to OCGA §§ 16-1-6 (1), 16-1-7 (a) (1),] for determining when one offense is included in another: "(A) single act may constitute an offense which violates more than one statute, ' "and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other." (Cit.)' [Cit.]" [Cit.]

*Linson v. State*, 287 Ga. 881, 885 (4) (700 SE2d 394) (2010). Both malice murder and aggravated battery require a malicious intent. See OCGA §§ 16-5-1 (a), 16-5-24 (a).

> However, " '(t)he fact that (such intent) supports an element in each crime does not warrant merging of the sentences where other mutually exclusive elements of the crimes remain.' (Cit.)" [Cit.] The other elements of the two

offenses must be compared. "Malice murder, but not [aggravated battery], requires proof that the defendant caused the death of another human being . . . . OCGA § 16-5-1 (a)." [Cit.]

*Linson v. State,* supra. "Aggravated battery . . . requires proof that the victim was deprived of a member of his body . . . , or that such member was rendered useless or seriously disfigured. OCGA § 16-5-24 (a); [cit.]" *Waits v. State,* supra. This required injury is the only element of aggravated battery which is arguably not also part of the required proof for malice murder. Determination of that question would depend upon whether the proof of death required for murder is viewed as necessarily including proof that a bodily member was rendered useless and the victim deprived thereof. However, even if aggravated battery does require proof of an injury which malice murder does not, merger of the two crimes may still be required by Georgia's statutory definition of included offenses. *Drinkard* explained as follows:

> The "required evidence" test applies strictly within the context of determining whether multiple convictions are precluded because one of the crimes was "established by proof of the same or less than all the facts" that were required to establish the other crime under OCGA § 16-1-6 (1). There are additional statutory provisions concerning prohibitions against multiple convictions for closely related offenses . . . . These provisions include: OCGA § 16-1-6 (1) (one crime is included in the other where it is established by "proof of . . . a less culpable mental state"); OCGA § 16-1-6 (2) (one crime is included in the other where it differs only in that it involves a "less serious injury or risk of injury to the same person, property, or public interest or a lesser kind of culpability"); and OCGA § 16-1-7 (a) (2) (precluding multiple convictions where one crime differs from another "only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct"). These other statutory provisions resolve potential gaps in the *Blockburger* [*v. United States,* 284 U. S. 299 (52 SC 180, 76 LE 306) (1932)] "required evidence" analysis which otherwise might support multiple convictions for closely related offenses where multiple convictions are unwarranted. [Cits.]

*Drinkard v. Walker,* supra at 216, fn. 32. For this explanation and other portions of *Drinkard,* this Court relied heavily on Justice

Marshall's dissenting opinion in *Haynes v. State*, 249 Ga. 119, 121-130 (288 SE2d 185) (1982). As further explained in that opinion, by providing that a crime is included if "[i]t differs from the crime charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest . . . suffices to establish its commission," OCGA § 16-1-6 (2) "recognizes that a crime such as battery, which prohibits the intentional infliction of bodily injury, is included in a crime such as murder, which prohibits the intentional infliction of more serious bodily injury, i.e., death," despite the distinction between these two injury elements. *Haynes v. State*, supra at 129 (3) (b) (2) (Marshall, J., dissenting). Similarly, it is clear that the only difference between aggravated battery and murder is that the former requires a less serious injury to the person of the victim, as the injury to a bodily member specified in the aggravated battery statute is obviously less serious than death. Therefore, pretermitting whether these two offenses meet the "required evidence" test, convictions for both offenses established by the same conduct are prohibited by OCGA § 16-1-6 (2). Accordingly, the convictions and sentences entered on the aggravated battery counts must be vacated.

### Pre-trial Issues

2. Ledford contends that the trial court erred by refusing to order a change of venue based on pre-trial publicity. In order to be entitled to a change of venue, Ledford was required to "show that the trial setting was inherently prejudicial as a result of pretrial publicity or show actual bias on the part of the individual jurors." *Gissendaner v. State*, 272 Ga. 704, 706-707 (2) (532 SE2d 677) (2000). Our review of the record reveals that much of the pre-trial publicity in Ledford's case was long before the trial and that much of the publicity provided little detail about the case and was accurate. *Gissendaner v. State*, supra at 706 (2). Although our own review of the record reveals that 22 of the 120 jurors questioned on the subject were excused for cause based at least in significant part on exposure to information about the case pre-trial, we note that most jurors had heard nothing of particular import to our analysis regarding venue and that the trial court exercised an "exacting standard" in evaluating jurors' qualifications for service. *Gissendaner v. State*, supra at 707 (2). In light of these considerations, we find that the trial court did not abuse its discretion in denying the motion for a change of venue. *Gissendaner v. State*, supra at 706 (2).

3. Ledford argues that the trial court erred by denying his motion challenging the constitutionality of Georgia's death penalty

laws on various grounds. For the reasons set forth below, we find no error.

(a) Ledford argues that Georgia's death penalty laws are applied in a discriminatory manner. However, he has utterly failed to show that any such discrimination has occurred in his case. *McCleskey v. Kemp*, 481 U. S. 279 (107 SC 1756, 95 LE2d 262) (1987); *Jenkins v. State*, 269 Ga. 282, 285 (2) (498 SE2d 502) (1998).

(b) A defendant's right to inquire into the ability of prospective jurors to consider mitigating evidence is not improperly limited by this Court's direction that prospective jurors should not be asked to prejudge a given case based on hypothetical evidence. See *Lucas v. State*, 274 Ga. 640, 646 (9) (555 SE2d 440) (2001); *King v. State*, 273 Ga. 258, 267 (18) (e) (539 SE2d 783) (2000). The right to have jurors consider mitigating evidence is also not improperly limited by the expansive definition of mitigating evidence given to juries in Georgia. See *Rhode v. State*, 274 Ga. 377, 384 (15) (552 SE2d 855) (2001); Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (4th ed.), § 2.15.30.

(c) Georgia's statutory aggravating circumstances do not fail to adequately narrow the class of cases eligible for the death penalty, and they do not otherwise promote the arbitrary and capricious infliction of the death penalty. See *Gregg v. Georgia*, 428 U. S. 153 (96 SC 2909, 49 LE2d 859) (1976); *Arrington v. State*, 286 Ga. 335, 336-337 (4) (687 SE2d 438) (2009).

(d) This Court does not conduct its statutorily-mandated proportionality review in an unconstitutional manner. See *Arrington v. State*, supra at 337 (4); *Gissendaner v. State*, supra at 716 (16).

4. Ledford argues that Georgia's method of execution by lethal injection is unconstitutional. In support of this claim, Ledford relies on evidence from another death penalty case in which this Court rejected a similar claim. See *Nance v. State*, 280 Ga. 125, 127 (4) (623 SE2d 470) (2005). As we have done repeatedly, we hold that this evidence fails to show that Georgia's method of lethal injection is unconstitutional. See *Stinski v. State*, 286 Ga. 839, 844 (17) (691 SE2d 854) (2010); *O'Kelley v. State*, 284 Ga. 758, 769-770 (4) (670 SE2d 388) (2008) (citing *Baze v. Rees*, 553 U. S. 35 (128 SC 1520, 170 LE2d 420) (2008)).

## Jury Selection Issues

5. In conducting its initial voir dire of the first three prospective jurors, the trial court, relying on the pattern jury instructions, described the malice involved in the crime of malice murder as being "the unlawful intention to kill without justification, excuse, or mitigation." Suggested Pattern Jury Instructions, Vol. II: Criminal

Cases (4th ed.), § 2.10.10. Ledford objected to the trial court's reference to an absence of "mitigation" in this context, arguing that it had the potential to mislead jurors into believing in the sentencing phase that, by finding Ledford guilty of malice murder, they had already excluded the possibility of there being any mitigation relevant to sentencing. The trial court proposed modifying its statement about malice murder and "mitigation," and it proceeded, without any specific objection to its doing so as proposed, with the voir dire of two additional jurors. After the voir dire of these two jurors, Ledford objected again, and the trial court agreed simply to omit any future reference to "mitigation" in its definition of malice murder. Ledford then moved the trial court to excuse all of the jurors already found qualified. In light of the detailed voir dire conducted by the trial court itself, the great latitude granted to the parties to conduct their own voir dire of the jurors in question, and the trial court's charges to the jury in the sentencing phase, we find that those jurors would not have been confused about the role of mitigating circumstances in the sentencing phase. Accordingly, we hold that the trial court did not err by refusing to excuse the jurors in question. The trial court, in its discretion, might have considered allowing additional voir dire if Ledford had requested it, but Ledford made no such request. See *Arrington v. State*, supra at 338 (7) ("The scope of voir dire is generally a matter for the trial court's discretion."). We find no error.

6. Ledford argues that the trial court improperly excluded a number of prospective jurors based on their views on the death penalty.

> The proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment "is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " [Cits.] On appeal, the relevant inquiry is whether the trial court's qualification of the prospective juror is supported by the record as a whole. [Cit.] An appellate court must pay deference to the finding of the trial court; this deference includes the trial court's resolution of any equivocations or conflicts in the prospective juror's responses on voir dire. [Cit.] "Whether to strike a juror for cause is within the discretion of the trial court and the trial court's rulings are proper absent some manifest abuse of discretion." [Cit.]

*Nance v. State*, 272 Ga. 217, 222 (6) (526 SE2d 560) (2000). Applying this standard below, we find no error.

(a) Although Juror Debellevue initially stated that she could consider a death sentence under certain circumstances, she gradually moved from that position, explaining that she had been "nervous" when she gave her earlier responses. As questioning by the parties continued, the juror settled on the position that she did not believe that she could impose a death sentence even under the most extreme hypothetical circumstances that she had previously volunteered as examples. Finally, the juror stated clearly that she could not impose a death sentence under any circumstances whatsoever. The trial court did not abuse its discretion in finding that the juror's responses, taken as a whole, indicated that she was unqualified.

(b) Jurors Davis and Barnes stated repeatedly and clearly that they were conscientiously opposed to the death penalty and could not consider it as a sentencing option. The trial court did not abuse its discretion in finding them unqualified.

(c) Although Juror Grayson initially indicated merely that she did not know if she could impose a death sentence and that she would have to struggle with whether she could do so, she eventually settled clearly and firmly on the position that she would not consider imposing a death sentence under any circumstances. The trial court did not abuse its discretion in finding her unqualified.

(d) Juror Berg stated clearly that she would not consider either a death sentence or a sentence of life with the possibility of parole. The trial court did not err in finding her unqualified.

(e) Juror Wade stated repeatedly and clearly that she would not consider a death sentence under any circumstances. The trial court did not err in finding her unqualified.

(f) As to Jurors Lecca, Ricker, and Jackson, Ledford's only contention is that it is always improper to disqualify jurors simply because they would never be able to actually vote to impose a death sentence. This Court has rejected this view repeatedly. See *Arrington v. State*, supra at 336 (2); *Riley v. State*, 278 Ga. 677, 685 (6) (B) (604 SE2d 488) (2004).

7. Ledford argues that the trial court erred by finding a number of jurors qualified to serve over his objection based on their death penalty views or their views regarding the sentence of life with the possibility of parole. We have set forth the relevant standards for claims regarding death penalty views as follows:

> Because Georgia law entitles a defendant to a panel of 42 qualified jurors, the erroneous qualifying of a single juror for the panel from which the jury was struck requires reversal. [Cit.] "A juror who will automatically vote for the death penalty in every case" upon a conviction for murder is not qualified to serve. [Cit.] This is true because such a

juror, instead of giving consideration to mitigating circumstances, begins the trial with an unwavering bias in favor of one of the sentences authorized under law, to the exclusion of the others. [Cit.] A potential juror's views on capital punishment will disqualify the juror from service if the juror's views would prevent or substantially impair the performance of the juror's duties as a juror in accordance with the instructions given the juror and the oath taken by the juror. [Cits.] In conducting our review, this Court views the voir dire of each juror as a whole and gives deference to the findings of the trial court concerning any juror's possible bias. [Cit.]

*Lance v. State*, 275 Ga. 11, 15-16 (8) (560 SE2d 663) (2002). We have also held that a juror's willingness to consider a sentence of life with the possibility of parole is governed by these same standards. See *Sealey v. State*, 277 Ga. 617, 619 (5) (593 SE2d 335) (2004). Applying these standards below, we find no error.

(a) Juror Greeson's voir dire responses, viewed as a whole, clearly indicated a willingness to consider mitigating evidence and to consider all three sentencing options. The trial court did not abuse its discretion in finding this juror qualified.

(b) After Ledford objected to a question to Juror Marino about whether he could "look [Ledford] in the eye" and sentence him to death, the trial court sustained the objection on the ground that the juror would never be required to look the defendant in the eye while the jury rendered its sentence. The trial court then asked a proper question regarding whether the juror, under appropriate circumstances, could ever sentence "any person" to death. We find nothing disqualifying about this juror's death penalty views. Furthermore, Ledford's claim regarding the juror's death penalty views, to the extent that he has attempted to raise one, was waived by his failure to raise any relevant objection at trial. See *Braley v. State*, 276 Ga. 47, 51 (11) (572 SE2d 583) (2002).

(c) Ledford argues that Juror Sherrill should have been excused because he would refuse to consider a sentence of life with the possibility of parole. Juror Sherrill, at first, gave conflicting responses regarding his willingness to consider life with the possibility of parole. However, in light of his later, clear responses indicating that he would consider that sentence and in light of his explanation that his responses had changed based on his fuller understanding of the trial process, the trial court did not abuse its discretion in finding him qualified.

(d) Juror Ridarick's responses indicated that he leaned somewhat in favor of sentences other than life with the possibility of

parole but that he would consider imposing life with the possibility of parole in light of the evidence presented at trial. The trial court did not abuse its discretion in finding him qualified.

(e) Despite Juror Childers' response to an improper hypothetical question regarding what sentence she would impose "if the crime was really bad," her remaining responses clearly indicated that she was willing to consider all of the evidence at trial and all three sentencing options. The trial court did not abuse its discretion in finding her qualified.

(f) Juror Cash initially stated repeatedly that she could consider all three sentencing options. Although she later seemed to indicate at one point that she would not consider a sentence less than death, she then clarified by indicating that, although she had a leaning in favor of the death penalty, she would consider all of the evidence and all three sentencing options. The trial court did not abuse its discretion in finding that the juror's responses, taken as a whole, indicated that she was qualified. See *Pace v. State*, 271 Ga. 829, 834 (7) (524 SE2d 490) (1999) (noting that "[a] prospective juror is not subject to excusal for cause for merely leaning for or against a death sentence").

(g) Although Juror Slate indicated that she generally was in favor of the death penalty for religious reasons, she also indicated repeatedly that her religious views would not prevent her from considering all of the evidence and all three sentencing options. The trial court did not abuse its discretion in finding her qualified.

(h) Juror Fennelly initially indicated that she would not consider a sentence of life with the possibility of parole. However, after receiving an explanation about the trial process and the law and after further contemplating her position, she explained that she would consider all of the evidence and all three possible sentences. The trial court did not abuse its discretion in finding her qualified.

(i) Juror Dunbar stated that it was "highly improbable" that he would find sufficient mitigating circumstances to warrant a sentence of life with the possibility of parole. He also acknowledged, in responding to a question invoking technical legal terminology that might have been unfamiliar to him, that he might be substantially impaired in his ability to select such a sentence. Nevertheless, the juror's responses indicating that he would consider mitigating evidence and all three sentences, especially when combined with the trial court's detailed observations about the juror's demeanor in giving various responses, lead us to conclude that the trial court did not abuse its discretion in finding the juror qualified.

(j) Although Juror Fitzpatrick initially gave responses indicating that he would not consider life with the possibility of parole as a sentencing option, he later clarified that he would consider all of the

evidence and would consider life with the possibility of parole under certain circumstances. The trial court did not abuse its discretion in finding the juror qualified.

(k) Ledford argues that Jurors McClung and Halualani should have been excused based on their death penalty views. Although not noted by either of the parties, our own review of the record reveals that these two jurors were eventually excused for other reasons. Accordingly, we find no possibility of reversible error. See *Butts v. State*, 273 Ga. 760, 763 (4) (546 SE2d 472) (2001) ("Because it appears that [the appellant's] suggestion that the juror was ultimately found qualified to serve is false, we find no error.").

8. Ledford complains that a number of jurors should have been disqualified from service on grounds unrelated to their willingness to consider all three sentencing options. We find no error.

(a) The trial court did not abuse its discretion by refusing to excuse Juror Belanger based solely on the fact that he and his wife had twice ridden bicycles on the Silver Comet Trail, particularly because the juror indicated that his past contact with the trail would not affect his deliberations. See *Gissendaner v. State*, supra at 707 (3) (a) ("A prospective juror need not be 'totally ignorant of the facts and issues involved' in a criminal proceeding in order to be qualified to serve." (quoting *Irvin v. Dowd*, 366 U. S. 717, 722 (81 SC 1639, 6 LE2d 751) (1961)); *DeYoung v. State*, 268 Ga. 780, 784 (4) (493 SE2d 157) (1997) (noting the trial court's discretion in determining whether a juror should be disqualified based on pre-trial exposure to information about the case).

(b) Ledford argues that the trial court erred in refusing to excuse Juror Marino based on the fact that the juror had done one internet search that had led him to an article revealing nothing prejudicial to Ledford and based on the fact that the juror's wife had learned about a murder on the Silver Comet Trail and was no longer willing to use the trail. The trial court did not abuse its discretion by finding this juror qualified. *Gissendaner v. State*, supra.

(c) Ledford argues that the trial court erred by refusing to excuse Juror Toler based on the fact that the juror had seen some reports indicating that a murder had occurred and on the fact that the juror recalled hoping at that time that the person guilty of such a "heinous crime" would be brought to justice. In light of Juror Toler's remaining voir dire responses indicating that he had not formed an opinion regarding Ledford's guilt or the appropriate sentence for the perpetrator of the murder, we find that the trial court did not abuse its discretion by finding this juror qualified. *Gissendaner v. State*, supra.

(d) We reject Ledford's argument that Juror Williams was unqualified to serve as a juror simply because she, as a veterinarian,

had euthanized animals and believed that the process was "humane." Jurors in Georgia death penalty trials are never instructed to consider the method of execution in their deliberations. See *Smith v. State*, 270 Ga. 240, 250-251 (16) (510 SE2d 1) (1998) (noting that the nature of Georgia's method of execution is irrelevant in the sentencing phase), overruled on other grounds, *O'Kelley v. State*, supra at 768 (3). Furthermore, to the extent that there was any possibility that Juror Williams, or any other jurors for that matter, might express the view during deliberations that Georgia's method of execution is humane, we see no potential for prejudice to Ledford in light of our own prior holdings expressing that same view. Accordingly, we conclude that the trial court did not abuse its discretion by finding this juror qualified. *Gissendaner v. State*, supra at 707 (3) (a); *DeYoung v. State*, supra at 784 (4).

9. Ledford argues that the trial court erred by limiting the voir dire of a number of jurors. For the reasons set forth below, we find no abuse of the trial court's discretion in limiting the scope of voir dire. See *Arrington v. State*, supra at 338 (7) ("The scope of voir dire is generally a matter for the trial court's discretion.").

(a) The trial court did not err by refusing to allow Ledford to question Juror Bailey regarding what weight she might give in her sentencing deliberations to several specific hypothetical factors. See *Lucas v. State*, supra at 646 (9); *King v. State*, supra at 267 (18) (e). The trial court also did not err by refusing to allow Ledford to ask Juror Bailey the largely irrelevant question of whether she would want a juror like herself to serve as a juror but, instead, itself asking the juror the more relevant question of whether she believed she could be fair and could consider all three sentencing options.

(b) After the State objected to a vague, hypothetical question to Juror Hurtado about whether "someone [who] has done something wrong" is entitled to mercy, the trial court asked a related, proper question about whether the juror would consider all of the mitigating evidence. We find no abuse of discretion by the trial court. Furthermore, this claim is waived, because Ledford did not object to the trial court's resolution of the matter. *Braley v. State*, supra at 52 (18).

(c) Ledford complains that the trial court improperly sustained an objection to his question to Juror Toler regarding what opinion about sentencing the juror might have had when he first learned some limited information about the crimes. Our review of the record reveals that, regardless of the merit to Ledford's initial objection, the trial court ultimately resolved the matter appropriately by determining through its own questions that the juror had not formed any such opinion. Furthermore, Ledford has waived this claim by failing to object to the trial court's resolution of the matter. *Braley v. State*, supra.

(d) Ledford made no objection to the trial court's briefly interrupting his voir dire of Juror Ingram after Ledford asked a question that could have been construed as seeking a prejudgment of the case by the juror. Ledford then interrupted the trial court and immediately continued his voir dire of the juror without any restrictions. We find that Ledford has waived his claim regarding any alleged limitation of this portion of his voir dire of the juror. *Braley v. State,* supra.

In another portion of Ledford's voir dire of Juror Ingram, the State objected to a question by Ledford about whether the juror would consider life with the possibility of parole in a case involving "no excuse [and] no justification." In response to the State's objection on the basis that the question called for a prejudgment of the case, the trial court attempted to resolve the matter by asking its own question about the juror's willingness to consider all three sentences. Ledford pursued the matter by stating that he still wished to have the juror answer his initial question. However, after the trial court indicated properly that it would not allow any questions regarding what the juror would do in a hypothetical "extreme case" and asked several more of its own questions to the juror, Ledford raised no further objection and continued by reminding the juror of the definition of murder and questioning the juror extensively about whether she would consider a sentence of life with the possibility of parole upon a conviction for murder. Under these circumstances, we find that Ledford has waived his right to claim that the trial court improperly limited his voir dire. *Braley v. State,* supra.

(e) Juror Berg stated that she opposed the death penalty because it foreclosed the possibility that a defendant could change in the future. The trial court disallowed a question by Ledford to Juror Berg regarding whether her views on the death penalty might change if she could be assured that there would be a sufficient gap in time between sentencing and the execution of any death sentence. We find that the trial court did not abuse its discretion in limiting the scope of voir dire by disallowing this question, which would have been meaningful only if combined with improper speculation about the length of any appeal process.

10. Ledford argues that the trial court erred by denying his claim that the State had used its peremptory strikes in a racially discriminatory manner by using one of its strikes against the only African-American juror on the list of jurors from which the panel of 12 jurors was selected. See *Batson v. Kentucky,* 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986). After the trial court found that Ledford had made a prima facie showing of discrimination, the State presented racially neutral reasons for its strike. We find the State's racially neutral reasons to be satisfactory. Ledford attempted to show in the trial

court that the State's racially neutral reasons were pretextual, but we find that the State provided a satisfactory response indicating otherwise. In light of Ledford's failure to explain on appeal specifically why a different conclusion is warranted, the trial court's finding that Ledford failed to carry his burden of proof was not clearly erroneous. See *Brannan v. State*, 275 Ga. 70, 75 (5) (561 SE2d 414) (2002).

11. Ledford also argues that the State engaged in gender-based discrimination in its use of peremptory strikes. See *J. E. B. v. Alabama*, 511 U. S. 127 (114 SC 1419, 128 LE2d 89) (1994). The record shows that, during the selection of the panel of 12 jurors, the State used 75 percent of the peremptory strikes it exercised to strike women. The trial court found that Ledford failed to make a prima facie showing of discrimination and, therefore, did not require the State to offer gender-neutral reasons for its strikes. In light of Ledford's failure to present any "additional facts which may give rise to an inference of discriminatory purpose," we hold that the trial court did not err in concluding that Ledford had failed to carry his burden of establishing a prima facie case of discrimination. *Whitaker v. State*, 269 Ga. 462, 464 (3) (499 SE2d 888) (1998) (addressing the State's use of 66 percent of its peremptory strikes to strike women).

*Guilt/Innocence Phase Issues*

12. Ledford argues that the trial court erred by admitting evidence of two similar transactions. See *Williams v. State*, 261 Ga. 640, 641-642 (2) (409 SE2d 649) (1991). For the reasons set forth below, we find no error.

(a) The first similar transaction involved the rape of a woman in Paulding County in 1991, for which Ledford was convicted and served ten years in prison. The trial court charged the jury that the evidence was being admitted as possible evidence of "intent, lustful disposition, bent of mind, and course of conduct. . . ." The trial court did not err by finding that the rape was sufficiently similar to form probative evidence on these matters regarding Ledford's pending charges of aggravated sodomy and aggravated assault committed with the intent to rape. See *Hinton v. State*, 280 Ga. 811, 817-818 (6) (631 SE2d 365) (2006). The lapse in time between this rape and the murder does not erode the relevance of the rape in the guilt/innocence phase of this case, especially because that lapse is explained by Ledford's ten-year incarceration for the rape. *Hinton v. State*, supra. See also *Pareja v. State*, 286 Ga. 117, 120-121 (686 SE2d 232) (2009). Finally, the trial court did not abuse its discretion by not excluding the evidence on the ground that its probative value was outweighed by improper prejudice. See *Hall v. State*, 287 Ga. 755,

757 (2) (699 SE2d 321) (2010) ("[A]ny prejudice from the age of these prior incidents was outweighed by the probative value of the evidence under the particular facts of this case and the purpose for which the similar transactions were offered.").

(b) The second similar transaction involved Ledford's attempt to subdue a woman riding her bicycle on the Silver Comet Trail in 2005. The trial court charged the jury that the evidence was being admitted as possible evidence of "the modus operandi, common plan and scheme in the crimes charged in this case now on trial." There is no merit to Ledford's argument that the evidence used to prove the actual occurrence of this similar transaction was inadequate. See *Gardner v. State*, 273 Ga. 809, 810-811 (2) (546 SE2d 490) (2001) ("The state is only required to prove the accused committed a similar transaction by a preponderance of the evidence."). The trial court properly admitted this evidence, because it tended to confirm Ledford's role as the perpetrator of the successful abduction of the victim in this case under very similar circumstances. See *Phillips v. State*, 287 Ga. 560, 563-564 (4) (697 SE2d 818) (2010).

13. We reject Ledford's claim that the trial court erred in several ways regarding the jury's viewing the crime scene. The only objection Ledford raised at trial regarding the scene view was based on the fact that the vegetation at the scene had changed since the murder. However, we find that the trial court did not abuse its discretion by allowing the scene view over this objection, because the scene view might have aided the jurors in their understanding of the evidence despite the changes and because the jurors were able to see the original condition of the scene in the photographs that were in evidence. See *Gissendaner v. State*, supra at 711-712 (8) (noting the trial court's discretion in considering a request to have the jury view the crime scene). Ledford's remaining complaints about the manner in which the scene view was conducted are waived, because they were not raised at trial. See *Earnest v. State*, 262 Ga. 494, 495 (1) (422 SE2d 188) (1992).

14. In preparing the jury for its visit to the crime scene, the trial judge stated, "I'll ask the Sheriff to go because in the woods there are all kinds of critters, snakes and dogs and cats and whatever that might be out there." Ledford contends that this statement constituted an impermissible comment on the evidence by the trial court in violation of OCGA § 17-8-57. Specifically, Ledford argues that the statement expressed the opinion that the victim's body likely had suffered damage from animals and insects prior to or after her death.

The State notes that Ledford made no objection to the trial court's statement, and the State relies on the proposition that "the issue of whether OCGA § 17-8-57 was violated is not reached unless an objection or motion for mistrial is made on that ground." *Whitner*

*v. State*, 276 Ga. 742, 744-745 (3) (584 SE2d 247) (2003). However, we have explicitly disapproved similar language in other opinions. *Patel v. State*, 282 Ga. 412, 413, fn. 2 (651 SE2d 55) (2007) (disapproving inconsistent language in other cases). Even where a defendant has failed to object or move for a mistrial in response to an alleged comment on the evidence by the trial court in violation of OCGA § 17-8-57, this Court nevertheless will examine the claim for plain error. *Patel v. State*, supra. See also *State v. Gardner*, 286 Ga. 633, 634 (690 SE2d 164) (2010); *Paul v. State*, 272 Ga. 845, 848-849 (3) (537 SE2d 58) (2000) (applying the plain error standard). Furthermore, we note that "a violation of OCGA § 17-8-57 will *always* constitute 'plain error'. . . ." (Emphasis in original.) *State v. Gardner*, supra at 634. Therefore, even where a defendant has failed to object or move for a mistrial, "[o]n appeal, the issue is simply whether there was such a violation." *State v. Gardner*, supra. To the extent that *Whitner* or any other cases suggest otherwise, they are disapproved. In addition to *Whitner*, such cases arguably include *Walker v. State*, 282 Ga. 774, 777 (4) (653 SE2d 439) (2007), *Pittman v. State*, 273 Ga. 849, 851, fn. 2 (546 SE2d 277) (2001), and *Paul v. State*, supra at 849 (3).

Although Ledford's claim that the trial court's comments violated OCGA § 17-8-57 is reviewable as possible plain error, the claim must fail because the trial court's statement was not improper. In the hearing held outside the presence of the jury, the trial judge noted that he had been confronted by a menacing dog when he visited the crime scene, and defense counsel noted that he had encountered a snake during his visit to the scene. Particularly under these circumstances, we find that the trial court's statement to the jury about animals and insects at the crime scene was not an improper comment on the evidence but, instead, was a proper exercise of the trial court's duty to manage the trial proceedings and to ensure the well-being of the jury. See *Walker v. State*, supra at 777 (4) (noting that comments made in rendering rulings generally are not impermissible comments on the evidence); *Whitner v. State*, supra at 744-745 (3) (noting that comments made in an "attempt to regulate the proceedings" generally are not impermissible comments on the evidence). See also *Hufstetler v. State*, 274 Ga. 343, 345 (2) (553 SE2d 801) (2001) ("Under these circumstances, no reasonable juror would have interpreted the trial court's remark as the expression of an opinion on any issue to be decided in the case.").

15. Ledford claims that the prosecutor argued improperly by stating in a raised voice that the victim was "kicked," "stomped," and "hit." The content of this argument was not improper, because it was based on a reasonable inference from the evidence. See *Payne v. State*, 273 Ga. 317, 318 (4) (540 SE2d 191) (2001) ("In closing

argument, counsel may draw any reasonable and legitimate inference from the evidence."). As to the volume at which the argument was made, we find nothing in the record to indicate that the trial court abused its discretion by finding no impropriety. See *Morgan v. State*, 267 Ga. 203-204 (1) (476 SE2d 747) (1996) (noting that counsel are afforded wide latitude in their mode of speech in closing arguments and that trial courts have discretion in limiting closing arguments).

16. The trial court did not abuse its discretion in rejecting Ledford's claim that the prosecutor argued improperly by stating that the victim had intentionally left evidence for the jury to consider by wounding Ledford. *Morgan v. State*, supra.

17. Ledford contends that the prosecutor violated the proscription against "golden rule" arguments by urging the jury to think about the unpleasant way in which the victim had died. This argument was made as part of the prosecutor's argument that Ledford had acted with malice. "A 'golden rule' argument is one that, regardless of the nomenclature used, asks the jurors to place themselves in a victim's position." *Braithwaite v. State*, 275 Ga. 884, 885 (2) (b) (572 SE2d 612) (2002). We hold that this argument was not improper.

18. Ledford claims that the trial court erred by refusing to charge the jury on voluntary manslaughter. See OCGA § 16-5-2 (a) (providing that voluntary manslaughter occurs when one "causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person"). There was not even slight evidence to suggest that the victim was killed for any reason other than the victim's having bitten Ledford's penis in self-defense as he attempted to commit aggravated sodomy against her, facts which cannot form the basis for a charge on voluntary manslaughter. See *Beck v. State*, 272 Ga. 863, 865 (3) (535 SE2d 756) (2000) (noting that "when a victim is attacked by a defendant and the victim attempts to defend himself or end the altercation, the victim's actions in doing so cannot provide the serious provocation necessary to justify a charge on voluntary manslaughter").

19. Our review of the record reveals that, in the trial court's words, the jury had dated its guilt/innocence verdict in "multiple places." In response to Ledford's contention that the verdict was thereby rendered ambiguous, the trial court filed the first verdict form with the clerk, and provided the jury with a new verdict form to complete. Even assuming that there was any actual defect in the manner in which the first verdict form was dated, we find no error in the trial court's instructing the jury to complete a new verdict form

to remove any minor "scrivener's error" involved. *Jones v. State*, 273 Ga. 231, 235 (7) (539 SE2d 154) (2000).

*Sentencing Phase Issues*

20. There is no merit to Ledford's claim that victim impact testimony is categorically unconstitutional. See *Braley v. State*, supra at 54 (33). Ledford has withdrawn his claim that a certain video recording constituted improper victim impact evidence, conceding that the recording was not actually played for the jury at trial. The trial court did not err in admitting photographs of the victim in life. See *Lucas v. State*, supra at 648 (14).

21. Ledford argues that telephone calls he made from the jail were improperly admitted into evidence, citing only *Smith v. State*, 254 Ga. App. 107 (561 SE2d 232) (2002). *Smith* addresses the circumstances in which a person gives sufficient implied consent to having his or her telephone conversations recorded to render the recording lawful under OCGA §§ 16-11-62 and 16-11-66 and, thus, admissible under OCGA § 16-11-67. Because it appears that Ledford never objected to the recordings on these grounds, his claim is waived. See *Earnest v. State*, supra at 495 (1). Furthermore, the record clearly supports the trial court's finding, made sua sponte, that Ledford consented to the recording of the telephone calls.

22. Ledford contends that the prosecutor's closing argument in the sentencing phase was improper for a number of reasons. For the reasons set forth below, we find no error.

(a) Contrary to Ledford's contention, the prosecutor's argument that Ledford might present a future danger to others was based on specific evidence supporting that argument, including evidence that Ledford had sexually harassed a pregnant jail guard and had made sexual remarks to a 14-year-old girl over the telephone from the jail. Compare *Henry v. State*, 278 Ga. 617, 619 (1) (604 SE2d 826) (2004) ("An argument that a death sentence is necessary to prevent future dangerous behavior by the defendant in prison must be based on evidence suggesting that the defendant will be dangerous in prison.").

(b) The prosecutor's argument that Ledford had shown a lack of empathy by stating a desire to make money from his crimes was based on a recorded telephone call Ledford had made from the jail. This argument was not improper, because it was a based on a reasonable inference from the evidence. See *Payne v. State*, supra at 318 (4).

(c) There is no merit to Ledford's contention that it was improper for the prosecutor to argue that, based on his actions, Ledford had shown that "he believes in the death penalty." See

*Crowe v. State*, 265 Ga. 582, 592 (18) (c) (458 SE2d 799) (1995).

(d) Ledford contends that the following argument by the prosecutor was improper: "You haven't heard any evidence of his taking responsibility. . . ." The argument, in context, specifically referred to matters actually in evidence and made no reference to Ledford's decision not to testify. We conclude that the argument was not improper. See *Hammond v. State*, 264 Ga. 879, 886 (8) (b) (452 SE2d 745) (1995) ("We do not read the prosecutor's remark concerning Hammond's lack of remorse as a comment on Hammond's failure to testify during the sentencing phase.").

*Sentence Review*

23. Upon our review of the record, including the portion of the State's closing argument in the guilt/innocence phase to which Ledford has drawn our attention, we conclude that the sentence of death in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See OCGA § 17-10-35 (c) (1).

24. This Court is required by statute to review the sufficiency of the evidence supporting each of the statutory aggravating circumstances in death penalty cases. OCGA § 17-10-35 (c) (2).

The jury found that the murder was committed while Ledford was engaged in the commission of aggravated battery. See OCGA § 17-10-30 (b) (2). The jury further found that the murder was outrageously vile, horrible, or inhuman in that it involved torture, depravity of mind, and aggravated battery to the victim. See OCGA § 17-10-30 (b) (7). In response to *Godfrey v. Georgia*, 446 U. S. 420 (100 SC 1759, 64 LE2d 398) (1980), this Court set forth certain criteria which the evidence at trial must satisfy for the (b) (7) aggravating circumstance to be constitutionally applicable, including the following:

Under the plain meaning of the statute, not only must the murder be outrageously or wantonly vile, horrible or inhuman, but in addition, the facts of the case must show either an aggravated battery to the victim, torture of the victim, or depravity of mind of the defendant as hereinafter explained. An aggravated battery occurs when "(a) person . . . maliciously causes bodily harm to another by depriving him [or her] of a member of his [or her] body, or by rendering a member of his [or her] body useless, or by seriously disfiguring his [or her] body or a member thereof." [OCGA § 16-5-24 (a).] In order to constitute aggravated battery, the bodily harm to the victim must occur before death. [Cit.] Torture occurs when the victim is subjected to serious

physical abuse before death. [Cit.] Serious sexual abuse may be found to constitute serious physical abuse. [Cit.] Torture also occurs when the victim is subjected to an aggravated battery as hereinabove defined. . . . Insofar as aggravated battery and torture are concerned, only facts occurring prior to death may be considered. The death of a victim who dies instantaneously with little or no forewarning does not involve torture or aggravated battery ([cits.]); i.e., only facts showing aggravated battery or torture (as hereinabove defined), which are separate from the act causing instantaneous death, will support a finding of torture or aggravated battery. The instantaneous death of a victim as a result of being killed by a shotgun, although the scene of death be gruesome (no other facts appearing), does not constitute torture, aggravated battery or depravity of mind. ([Cit.]) Where only facts occurring prior to death are relied upon to support a finding of torture or aggravated battery, the fact that the victim was tortured or was the victim of an aggravated battery will also support a finding of depravity of mind of the defendant; i.e., a defendant who tortures the victim or subjects the victim to an aggravated battery before killing the victim can be found to have a depraved mind.

*Hance v. State*, 245 Ga. 856, 861-862 (3) (268 SE2d 339) (1980). See also *West v. State*, 252 Ga. 156, 161-162 (313 SE2d 67) (1984) (Appendix) (providing the pattern jury charge on torture to be given upon the defendant's request); *Krier v. State*, 249 Ga. 80, 88-89 (7) (287 SE2d 531) (1982); *Patrick v. State*, 247 Ga. 168, 169 (274 SE2d 570) (1981). With respect to an aggravated battery "alleged to have been committed upon the person who is also the murder victim, the same limitations . . . apply to the § (b) (2) circumstance as to the § (b) (7) circumstance." *Davis v. State*, 255 Ga. 588, 594 (3) (c) (340 SE2d 862) (1986).

As we noted above in our review of the sufficiency of the evidence to support the verdicts rendered by the jury in the guilt/innocence phase, although the evidence showed that the acts constituting the three aggravated batteries were the same as the acts constituting the murder, the separate aggravated battery verdicts are supported by the evidence that the victim's death was not instantaneous. For the same reason, the jury was authorized to find the statutory aggravating circumstance set forth in OCGA § 17-10-30 (b) (2) and the aggravated battery portion of the (b) (7) circumstance. See *Hall v. Terrell*, 285 Ga. 448, 452-453 (II) (C) (679 SE2d 17) (2009); *Perkins v. State*, 269 Ga. 791, 796 (6) (505 SE2d 16) (1998); *Hance v. State*, supra. Likewise, the jury's finding of torture was supported by the evidence that the

victim's death was not instantaneous, but was preceded by serious sexual abuse, as well as the serious physical abuse which constituted the aggravated batteries. See *Loyd v. State*, 288 Ga. 481, 489 (4) (b) (705 SE2d 616) (2011); *Hall v. Terrell*, supra; *Jones v. State*, 279 Ga. 854, 860 (7) (b) (622 SE2d 1) (2005); *Hance v. State*, supra. The authorized findings of aggravated battery and torture also support a finding of depravity of mind. See *Loyd v. State*, supra; *Perkins v. State*, supra; *Hance v. State*, supra at 862 (3). Furthermore, the shocking and vicious nature of the victim's murder by stomping and kicking authorized the jury to find that the murder was outrageously or wantonly vile, horrible, or inhuman. Accordingly, we find that the evidence was sufficient to support the jury's findings beyond a reasonable doubt of both the (b) (2) and (b) (7) statutory aggravating circumstances. See *Taylor v. State*, 261 Ga. 287, 297 (13) (c) (404 SE2d 255) (1991); *Patillo v. State*, 258 Ga. 255, 262-263 (6) (368 SE2d 493) (1988); *Jefferson v. State*, 256 Ga. 821, 828 (9) (353 SE2d 468) (1987); *Baxter v. State*, 254 Ga. 538, 549 (20) (b) (331 SE2d 561) (1985); *Conner v. State*, 251 Ga. 113, 116 (3) (303 SE2d 266) (1983); *Krier v. State*, supra at 89 (7); *Cape v. State*, 246 Ga. 520, 528-529 (13) (272 SE2d 487) (1980).

The jury also found two additional statutory aggravating circumstances involving Ledford's prior conviction for rape and his having committed the murder during the commission of a kidnapping with bodily injury. See OCGA § 17-10-30 (b) (1), (2). The evidence presented at Ledford's trial was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt the existence of these statutory aggravating circumstances. *Ring v. Arizona*, 536 U. S. 584 (122 SC 2428, 153 LE2d 556) (2002); *Jackson v. Virginia*, supra; OCGA § 17-10-35 (c) (2).

25. Considering both the crime and the defendant in this case, we find that the death sentence is not disproportionate punishment within the meaning of Georgia law. See OCGA § 17-10-35 (c) (3); *Gissendaner v. State*, supra at 716-717 (19) (a) (noting that this Court's statutorily-mandated proportionality review concerns whether a particular death sentence "is excessive per se" or is "substantially out of line" for the type of crime and defendant involved). This finding obviously takes into consideration the shocking details of the murder in this case. This finding also takes into consideration Ledford's long history of criminal acts against numerous women, including a rape, several apparent attempted rapes, and sexually-deviant behavior directed at women and his own 14-year-old relative. The cases cited in the Appendix support our finding in that each involves a jury's willingness to impose a death sentence where the defendant has a prior conviction for a capital felony, where the defendant committed murder during both a sexual assault and a

kidnapping, or where the murder involved aggravated battery, torture, or depravity of mind. See OCGA § 17-10-35 (e).

*Judgments affirmed in part and vacated in part. All the Justices concur.*

APPENDIX.

*Loyd v. State*, 288 Ga. 481 (705 SE2d 616) (2011); *Tate v. State*, 287 Ga. 364 (695 SE2d 591) (2010); *Rivera v. State*, 282 Ga. 355 (647 SE2d 70) (2007); *Williams v. State*, 281 Ga. 87 (635 SE2d 146) (2006); *Nance v. State*, 280 Ga. 125 (623 SE2d 470) (2005); *Lewis v. State*, 279 Ga. 756 (620 SE2d 778) (2005); *Riley v. State*, 278 Ga. 677 (604 SE2d 488) (2004); *Franks v. State*, 278 Ga. 246 (599 SE2d 134) (2004); *Sealey v. State*, 277 Ga. 617 (593 SE2d 335) (2004); *Sallie v. State*, 276 Ga. 506 (578 SE2d 444) (2003); *Braley v. State*, 276 Ga. 47 (572 SE2d 583) (2002); *Terrell v. State*, 276 Ga. 34 (572 SE2d 595) (2002); *Arevalo v. State*, 275 Ga. 392 (567 SE2d 303) (2002); *Lance v. State*, 275 Ga. 11 (560 SE2d 663) (2002); *Presnell v. State*, 274 Ga. 246 (551 SE2d 723) (2001); *Colwell v. State*, 273 Ga. 634 (544 SE2d 120) (2001); *Jones v. State*, 273 Ga. 231 (539 SE2d 154) (2000); *Heidler v. State*, 273 Ga. 54 (537 SE2d 44) (2000); *Drane v. State*, 271 Ga. 849 (523 SE2d 301) (1999); *Pace v. State*, 271 Ga. 829 (524 SE2d 490) (1999); *Johnson v. State*, 271 Ga. 375 (519 SE2d 221) (1999); *Lee v. State*, 270 Ga. 798 (514 SE2d 1) (1999); *Pruitt v. State*, 270 Ga. 745 (514 SE2d 639) (1999); *Pye v. State*, 269 Ga. 779 (505 SE2d 4) (1998); *Mize v. State*, 269 Ga. 646 (501 SE2d 219) (1998); *Raulerson v. State*, 268 Ga. 623 (491 SE2d 791) (1997); *Waldrip v. State*, 267 Ga. 739 (482 SE2d 299) (1997); *Jones v. State*, 267 Ga. 592 (481 SE2d 821) (1997); *Carr v. State*, 267 Ga. 547 (480 SE2d 583) (1997); *Davis v. State*, 263 Ga. 5 (426 SE2d 844) (1993); *Tharpe v. State*, 262 Ga. 110 (416 SE2d 78) (1992).

DECIDED MARCH 25, 2011 —
RECONSIDERATION DENIED APRIL 12, 2011.

*Jimmy D. Berry, Carl P. Greenberg, Thomas M. West*, for appellant.

*Fred A. Lane, Jr.*, District Attorney, *Thurbert E. Baker*, Attorney General, *Mary Beth Westmoreland*, Deputy Attorney General, *Patricia Attaway Burton*, Senior Assistant Attorney General, *Lyndsey J. Hurst*, Assistant Attorney General, for appellee.