300 Ga. 543
FINAL COPY

S16A1790. JONES v. THE STATE.
S16A1791. JONES v. THE STATE.

B<small>LACKWELL</small>, Justice.

Jami Lea Jones and her husband, Louis David Jones, were tried together

by a Walton County jury and convicted of the murder of their six-year-old son,

Colin,[1] among other crimes. Jami and Louis appeal, both contending that they

were denied the effective assistance of counsel. Jami alone also contends that the

trial court erred when it failed to instruct the jury sua sponte about certain

evidence. Upon our review of the record and briefs, we see no error, and we

affirm.[2]

_____

[1] Prior to Colin's adoption by Jami and Louis a few months prior to his death, Colin's name was Tyrese Devon Corroll.

[2] Colin died on December 28, 2009. A Walton County grand jury indicted Jami and Louis on March 22, 2010, charging each with malice murder, felony murder, and three counts of cruelty to a child. Jami and Louis's joint trial began on September 16, 2013, and the jury returned a verdict on September 19, finding Jami and Louis not guilty of one of the counts of child cruelty and guilty on all the other counts. Jami and Louis were both sentenced to imprisonment for life for malice murder. Jami filed a motion for new trial on September 25, 2013, and the trial court denied her motion on April 22, 2016. Louis filed a motion for new trial on September 23, 2013, he amended it on November 24, 2014, and the trial court denied his motion on April 22, 2016. Jami filed her notice of appeal on April 27, 2016, and Louis

1. Viewed in the light most favorable to the verdicts, the evidence shows that on December 24, 2009, Jami called 911 to report that Colin was having difficulty breathing. Colin and his younger brother had lived with Jami and Louis (and their older children) for just over a year, and the couple had adopted Colin in April 2009. When first responders arrived at the family's Loganville home, they found Colin and Louis in the bathroom. Colin was lying on the floor, had blood coming out of his mouth and bruises of different colors "from [his] head all the way to the bottom of his feet," and was unresponsive. Paramedics rushed Colin to the hospital, where he was intubated. In addition to having been beaten, doctors determined that Colin was malnourished and was suffering from a severe bacterial infection. Later that day, Colin was airlifted to a hospital in Atlanta, but he died four days later without ever regaining consciousness.

The medical examiner determined that Colin died from an infection that affected his entire body and that multiple blunt force traumas "absolutely" contributed to his death because they allowed bacteria to enter his body and impaired his ability to fight the infection. The medical examiner also found

filed his notice of appeal on May 2, 2016. The cases were docketed in this Court for the September 2016 term and orally argued on December 13, 2016.

2

neglect to be a cause of death given that Colin's injuries would have been "very obvious" in the days prior to December 24.

In numerous pretrial statements, Jami and Louis both said that Colin had significant behavioral problems and that they regularly "whooped" him to correct his misbehavior. They also maintained that Colin often fell down and that his lack of nourishment was due to the fact that he refused to eat or drink. Jami and Louis continued to pursue this defense at trial, arguing that they were truthful in their pretrial statements, that they lawfully disciplined Colin, and that they were not the cause of the bacterial infection that killed him. The jury rejected this defense, however, and found them guilty of killing Colin with malice aforethought.

Neither Jami nor Louis dispute that the evidence is sufficient to sustain their convictions. Nevertheless, we have independently reviewed the record with an eye toward the legal sufficiency of the evidence. We conclude that the evidence adduced at trial was legally sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Jami and Louis were not being truthful when they provided their pretrial statements and that they were guilty of malice murder. See Jackson v. Virginia, 443 U. S. 307, 319 (III) (B) (99 SCt

2781, 61 LE2d 560) (1979). See also <u>Rini v. State</u>, 235 Ga. 60, 67 (3) (218 SE2d 811) (1975) ("[t]he credibility of the defendant's statement to police is to be determined by the jury").

*Case No. S16A1790*

2. Jami appeals in Case No. S16A1790, and she argues that she was denied the effective assistance of counsel. To prevail on a claim of ineffective assistance, Jami must prove both that the performance of her lawyer was deficient and that she was prejudiced by this deficient performance. <u>Strickland v. Washington</u>, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove that the performance of her lawyer was deficient, Jami must show that the lawyer performed his duties at trial in an objectively unreasonable way, considering all the circumstances, and in the light of prevailing professional norms. Id. at 687-688 (III) (A). See also <u>Kimmelman v. Morrison</u>, 477 U. S. 365, 381 (II) (C) (106 SCt 2574, 91 LE2d 305) (1986). And to prove that she was prejudiced by the performance of her lawyer, Jami must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U. S. at 694

4

(III) (B). See also <u>Williams v. Taylor</u>, 529 U. S. 362, 391 (III) (120 SCt 1495, 146 LE2d 389) (2000). This burden is a heavy one, see <u>Kimmelman</u>, 477 U. S. at 382 (II) (C), and we conclude that Jami has failed to carry it.

(a) First, Jami claims that she was denied the effective assistance of counsel when her lawyer allowed the State to introduce two statements that Louis made to police investigators.[3] But Louis did not blame Jami for Colin's death in those statements. In fact, the statements were consistent with the defense that Jami (and Louis) presented at trial: that Colin was loved and lawfully disciplined by both his parents, that he was suffering from reactive detachment disorder (which caused him to display extreme misbehavior and to refuse to eat or drink), that he was unusually clumsy and would sometimes injure himself by squirming, spinning, or falling down when he was being disciplined, and that he died as a result of a bacterial infection that came on suddenly and not as a result of any action or neglect on the part of Jami or Louis. Given that neither Jami nor Louis would be testifying at trial, Jami's lawyer made the strategic decision that allowing the introduction of Louis's (and

---

[3] Louis provided the first statement on the night of December 24, shortly after Colin was brought to the hospital, and he gave the second statement on the afternoon of December 28, a few hours after Colin died.

Jami's) recorded pretrial statements would be the best way to present their consistent story to the jury. And the content of the statements was of particular importance given that part of Jami's (and Louis's) defense was that they were a religious couple who had never been in trouble and always told the truth. The introduction of the pretrial statements allowed them to argue that they had, from the very beginning, told the truth with transparency and consistency.

Certainly, the State was able to use some of the information provided in the statements against the defendants. For example, Jami and Louis said in their pretrial statements that they fed Colin bananas, Gatorade, and Pedialyte on the morning of December 24, but the State argued that they did so only because they knew they would "be in trouble" if they took him to a doctor. And although Louis (and Jami) acknowledged in the statements that they both had used corporal punishment on Colin in order to correct his misbehavior,[4] the State

---

[4] Even if it were otherwise, Jami and Louis made no secret of the fact that they used corporal punishment to correct Colin's misbehavior, so this fact was established by other evidence. Similarly, other evidence was available to establish many of the other admissions made in the pretrial statements. For example, the State emphasized to the jury that Jami admitted that Colin had been sleeping on a wooden board because he had soiled his bedding. But the fact that the mattress (and sheets and blankets) had been removed from Colin's bed was also established by pictures of the bed and the testimony of the police officer who observed Colin's bedroom on the day he was taken to the hospital.

argued that the killing had nothing to do with corporal punishment, that Jami and Louis were lying in their pretrial statements,[5] and that they beat and starved Colin and refused him medical treatment even though his suffering was obvious.

Moreover, Jami's lawyer had to defend against claims that she did these things with an "abandoned and malignant heart" sufficient to constitute malice murder. See OCGA § 16-5-1 (b) ("[m]alice shall be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart"). After having reviewed Louis's (and Jami's) recorded statements, we cannot say that no reasonable lawyer would have decided that the statements might be useful to create sympathy for the couple and convince a jury that they did not act with malice. And the fact that the jury was not persuaded by this strategy does not show that the performance of Jami's lawyer was deficient. See Grissom v. State, 296 Ga. 406, 412 (4) (768 SE2d 494) (2015) ("[d]ecisions relating to strategy and tactics must not be

---

[5] For example, both Jami and Louis said in their pretrial statements that Colin knocked out his front teeth in a fall, but the State argued that this was inconsistent with the medical evidence.

judged by hindsight or the ultimate result of the trial") (citation and punctuation omitted).[6]

(b) Jami also contends that she was denied the effective assistance of counsel when her trial lawyer failed to challenge the admissibility of two statements that she made on December 24 while Colin was in the hospital. But the record shows that Jami's lawyer *did* file a motion to suppress those statements, and he withdrew it for strategic reasons. At the hearing on Jami's motion for new trial, her trial lawyer said that he determined it was unlikely he would be successful in suppressing the statements[7] and, in any event, that it

---

[6] Jami also claims that the trial court should have sua sponte instructed the jury that Louis's statements could not be used against her. But given that Louis's statements were consistent with both Jami's pretrial statements and supported the common defense presented by both Jami and Louis, the failure to provide a limiting instruction did not likely affect the outcome of the proceedings and was not plainly erroneous. See DuBose v. State, 299 Ga. 652, 655 (4) (791 SE2d 9) (2016).

[7] The lawyer thought there was some chance he would be successful in suppressing the first statement (which was provided to a social worker with the Walton County Department of Family and Children Services ("DFACS")) on the basis that Jami was not provided with a Miranda warning. See Miranda v. Arizona, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966). But the lawyer also noted that the trial judge seemed inclined to deny a motion to suppress the first statement, and the lawyer recalled that he thought it was even less likely that he would be successful in suppressing the second statement, which was provided to police investigators. And that assessment was a correct one given that Jami was provided with a break after the DFACS interview and that the second statement was made after Jami signed a waiver of her Miranda rights, was made to a police detective who warned her that "we're not DFACS; we're the police," and was made without the detective reminding Jami about any admissions made in her first statement. See Spears v. State, 296 Ga. 598, 604 (4)

would be in Jami's best interest if both statements were played for the jury in their entirety. The trial lawyer knew that much of what Jami reported in the statements would be cumulative of other evidence presented at trial, especially evidence in other pretrial statements that she made to police investigators and Colin's doctors. And he concluded that playing Jami's recorded statements from the day her son was brought to the hospital would allow her to present her defense to the jury without requiring her to testify:

> [T]he Jury needed to know what kind of person she was. She is a very soft spoken sweet person. They were not going to know that. She gave her side of the story. The story that she was going to give if she would have testified as best as she could give it. She tried to tell the truth, that yes, she had done some bad things, but she certainly didn't kill the child. So I wanted that in there.

Having reviewed Jami's recorded statements, we find that this strategic decision does not amount to ineffective assistance. See Clark v. State, 299 Ga. 552, 556 (2) (c) (787 SE2d 212) (2016).

(c) Jami also asserts that her trial lawyer should have moved to strike or asked for a remedial instruction after the presentation of certain testimony. First, two witnesses made comments that connected the gruesomeness of Colin's

---

(769 SE2d 337) (2015).

injuries with the fact that they observed those injuries on Christmas Eve.[8] But the testimony that Jami complains about was relevant to show the emotional impact that Colin's injuries had on an emergency room physician (which in turn helped to explain why he failed to mention the bacterial infection to police) and to show why a police investigator remembered details about the case that were not included in his report. And while OCGA § 24-4-403 provides for the exculsion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice . . . ," there was little prejudice from the jury being reminded that Colin was brought to the hospital on Christmas Eve, and Jami's trial lawyer was able to point out that Colin's medical condition had nothing to do with the holiday.

Jami also says that her lawyer should have moved to strike the testimony of an emergency room physician who rhetorically asked: "Would you not have taken your child to see a doctor if they looked like that?" But, in response,

---

[8] First, an emergency room physician testified that when he saw Colin, "I had all I could do not to vomit. I mean this is Christmas Eve. This is not what you want to walk into on Christmas Eve. . . . I think what this body looked like to me was so horrifying and . . . on Christmas Eve. I understand I have worked probably 25 to 32 years on Christmas Eve, and this was ghastly." Later, a police investigator testified that, "this is the night before Christmas . . . [and] it's the worst case in my 39 years that I have ever seen on a child."

Jami's trial lawyer was able to make the point to the physician that hemolytic uremic syndrome (which, according to the defense, contributed to Colin's death) presents itself in a period of only about 24 hours. And at the hearing on Jami's motion for new trial, her lawyer said that he did not move to strike because that would only have brought attention to the physician's belief that Jami waited far too long to seek medical care for Colin.

Similarly, Jami says that her lawyer should have moved for a remedial instruction when the prosecuting attorney asked one of Colin's brothers if he could "think of any reason why your siblings would tell the investigator that [Jami] told them not to say anything." But at the hearing on Jami's motion for new trial, her lawyer properly recalled that the question (which was not answered) came in the middle of the brother's testimony and at a time when the lawyer thought some jurors may not have even "picked up" on what the prosecuting attorney asked, and he determined that moving for a remedial instruction would needlessly draw the jury's attention to the question. We cannot say that the strategy employed by Jami's lawyer was unreasonable. See Durham v. State, 292 Ga. 239, 242 (4) (a) (734 SE2d 377) (2012).

11

3. Finally, Jami asserts that the trial court erred when it failed to sua sponte instruct the jury to ignore testimony that Jami's expert witness had been hired by Jami's lawyer to participate in a separate case in which a mother was found guilty of suffocating her child. In addition, this witness was asked how much she was paid to testify both in the other case and at Jami's trial. Jami claims that this testimony was not relevant to any material issue, but we have held that "[t]he State's cross-examination of [an expert witness] concerning the number of times [s]he had been hired by defense counsel and how much [s]he was paid was appropriate to show that the objectivity of the witness may have been clouded." Whitner v. State, 276 Ga. 742, 745 (4) (584 SE2d 247) (2003) (citation omitted), disapproved of on other grounds by Ledford v. State, 289 Ga. 70, 85 (14) (709 SE2d 239) (2011).[9] As a result, the only portion of the testimony at issue that may have been irrelevant was the inclusion of the fact that the jury in the other case found the defendant guilty. And pretermitting whether allowing such testimony was obviously erroneous, Jami has not shown that the outcome of her trial likely was affected by the mention — in the middle

___

[9] Although Whitner was decided under former OCGA § 24-9-68, that statute has been retained without substantive changes in our new Evidence Code. See OCGA § 24-6-622.

of a long question to an expert witness — that a jury in a different case found another mother guilty of suffocating her child. As a result, Jami has not shown plain error. See, e.g., <u>DuBose v. State</u>, 299 Ga. 652, 655 (4) (791 SE2d 9) (2016).

*Case No. S16A1791*

4. Louis appeals in Case No. S16A1791, and — like Jami — he claims that he was denied the effective assistance of trial counsel. First, Louis asserts that his lawyer's performance was deficient when he failed to prevent the use of Jami's pretrial statements against him. In addition to the December 24 statements to the DFACS employee and the police investigator discussed in Division 2 (b), Louis says that his lawyer should have objected to the introduction of statements made by Jami in the emergency room soon after Colin was brought to the hospital and later statements that Jami made to Colin's doctors that described actions she and Louis took in the hours and days before Jami called 911. These actions included force-feeding Colin because he refused to eat, securing Colin's diaper with duct tape because he was defecating in the house, and putting Colin in the shower to revive him on December 24. But even assuming that these statements were testimonial and were not provided for the

13

purpose of advancing Colin's medical care, we cannot say that the performance of Louis's lawyer was deficient when he entered into an agreement with the State that allowed most of Jami's statements to be played for the jury. As already mentioned, Jami and Louis decided to present a consistent defense at trial, in which they claimed that Colin's injuries were caused by a sudden bacterial infection and not as a result of anything they did or failed to do as his parents. Jami's statements did not directly implicate Louis in any crime, and although she admitted that she sometimes "may have spanked [Colin] a little harder than I should've," she denied that Colin had been disciplined in a way that caused him any significant injury, much less that resulted in his death. As described above, Louis's lawyer had to present a defense against the State's claim that Louis killed Colin with an "abandoned and malignant heart." We cannot say that no reasonable lawyer would have decided that Jami's statements might create sympathy for Louis and convince a jury that he loved Colin and did not act with malice.

Louis also claims that he was denied the effective assistance of counsel when his trial lawyer failed to object to improper questions posed to his character witnesses by the prosecuting attorney. In both cases, after the character

14

witness testified that Louis had a good reputation, the prosecuting attorney asked if the witness believed that beating a child was a "good character trait" or if someone with a good reputation would "report child abuse if they saw child abuse going on." Louis argues that — if his lawyer had objected to these questions — the trial court would have disallowed them based on the rule that a character witness may not be asked "hypothetical questions that assume the guilt of the accused in the very case at bar." United States v. Guzman, 167 F3d 1350, 1352 (III) (11th Cir. 1999). But the questions posed in this case did not require the witnesses to "assume the guilt" of anyone, so the rule in Guzman is not directly on point.[10] And given that an objection would draw attention to the unfavorable testimony and would only be successful if the trial court was willing to apply an expansive interpretation of the rule in Guzman, we cannot say that the performance of Louis's lawyer was deficient for failing to pursue such an objection. See Ellis v. State, 292 Ga. 276, 287 (4) (e) (736 SE2d 412) (2013) (inasmuch as objection would have had questionable merit, it was not

[10] Given that both of the character witnesses were active in Louis's church, the questions may have been relevant to establish that the church did not approve or promote the physical discipline of children beyond what is permitted by law.

unreasonable trial strategy to withhold objection and avoid drawing needless attention to unfavorable testimony).

Finally, Louis contends that he was denied the effective assistance of counsel when his lawyer failed to prevent the State's medical experts from stating their opinions about what symptoms they thought Colin would have displayed before Jami called 911. But given that the cause of Colin's death was in dispute — with Jami and Louis arguing that he died from an infection that did not result in any observable symptoms until shortly before the 911 call — expert testimony about the symptoms that Colin may have displayed in the days prior to December 24 was relevant to show how the experts concluded that Colin's death was caused at least in part by abuse and neglect. The failure to object to such testimony does not amount to ineffective assistance. See McFolley v. State, 289 Ga. 890, 893 (717 SE2d 199) (2011).

Judgments affirmed. All the Justices concur.


Decided February 6, 2017.

Murder. Walton Superior Court. Before Judge Ott.


16

Garland, Samuel & Loeb, Donald F. Samuel, for appellant (case no. S16A1790).

Brian Steel, for appellant (case no. S16A1791).

Layla H. Zon, District Attorney; Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Scott O. Teague, Assistant Attorney General, for appellee.