**THIRD DIVISION**
**ELLINGTON, P. J.,**
**ANDREWS and RICKMAN, JJ.**

**NOTICE:** Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**August 9, 2017**

# In the Court of Appeals of Georgia

A17A1224. DUNCAN v. THE STATE.

RICKMAN, Judge.

Frank Lee Duncan was tried by a jury and convicted of two counts of aggravated sexual battery,[1] aggravated child molestation,[2] nine counts of child molestation,[3] and two counts of cruelty to children in the first degree.[4] On appeal, Duncan contends that his convictions must be reversed because his right to be present at his trial was violated by his absence from a hearing, there is a reasonable belief that the jurors convicted him of incest for conduct that was not a crime, the State failed

---

[1] OCGA § 16-6-22.2 (b).

[2] OCGA § 16-6-4 (c).

[3] OCGA § 16-6-4 (a) (1).

[4] OCGA § 16-5-70 (b).

to prove venue beyond a reasonable doubt for one of the child molestation counts, the trial court erroneously permitted extrinsic act evidence, and that his trial counsel was ineffective for failing to object when the State asked his character witnesses guilt-assuming hypotheticals. Duncan also contends that the trial court gave an improper jury instruction and the sentences on his child molestation convictions are illegal. For the following reasons, we affirm in part, reverse in part, and remand this case for proceedings consistent with this opinion.

> On appeal from a criminal conviction, we view the evidence in the light most favorable to support the jury's verdict, and the defendant no longer enjoys a presumption of innocence. We do not weigh the evidence or judge the credibility of the witnesses, but determine only whether the evidence authorized the jury to find the defendant guilty of the crimes beyond a reasonable doubt in accordance with the standard set forth in *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

(Citation and punctuation omitted.) *Hall v. State*, 335 Ga. App. 895 (783 SE2d 400) (2016).

So viewed, the evidence showed that in 2010, Duncan was the father of four daughters[5], 13–year-old triplets, V . D., F. D., and E. D., and 6-year-old L. D.[6] On the evening of September 11, 2010, V. D. sent a text message to her grandmother that read, "[o]kay I don't have much time, but [Duncan] sucked on [E. D.'s] nipple last night and kissed her [vagina], and [E. D.] just told her and Mom believes her and they are fighting and he said we're liars, don't say anything." After receiving the text message, the grandparents went to Duncan's residence to retrieve the triplets, took them back to their house, and called the police.

The text message was not the first time the triplets' grandfather had heard about the sexual abuse. Prior to the September 2010 incident, the triplets' grandfather was fishing with E. D. when she told him that Duncan was touching her inappropriately. At some point after the triplets' grandfather spoke with E. D., V. D. told him that Duncan had also fondled her, touched her inappropriately, and rubbed up against her.

An investigator with the Walton County Sheriff's Office responded to the grandparents' residence. The investigator spoke with each of the triplets. E. D. told

---

[5] Each of Duncan's daughters has the same first initial. For clarity, the daughters will be referred to by their middle and last initial in this opinion.

[6] Duncan adopted the triplets and is the biological father of L. D.

3

the investigator that Duncan had been going in and out of her bedroom throughout the day of the September 2010 incident to perform sexual acts on her. E. D. disclosed that Duncan kissed her, rubbed his penis on her, and touched her vagina. After dinner that evening, Duncan came into E. D.'s room and sucked her breast. V. D. told the investigator that Duncan had previously touched her inappropriately and that she had told her mother what had happened.

After speaking with the triplets, the investigator went to Duncan's residence, which was located in Walton County. The investigator spoke with Duncan and his wife, mother of the triplets and L. D. The triplets' mother initially told the investigator that she was not aware of the allegations, but then told the investigator that she had previously heard the triplets talking about Duncan molesting them, but that they ultimately recanted those allegations.

The investigator also spoke with Duncan, who denied the allegations. However, Duncan told the investigator that his wife confronted him in the past about allegations that he had touched and kissed V. D.'s stomach and touched the triplets between their legs in the pool while they were on vacation.

The triplets went to a child advocacy center for recorded forensic interviews during which they detailed allegations of sexual and physical abuse. Each of the triplets' forensic interviews were played for the jury.

At trial, E. D. testified that on the date of the September 2010 incident, Duncan put his lips on her breast and then kissed her vagina. E. D. heard her mom coming upstairs and Duncan "darted" out of her bedroom. E. D. told her mom what happened and her mom dismissed her concerns and told her to go to bed. After speaking with her mom, E. D. told V. D. what happened and V. D. sent the text message to their grandparents.

E. D. also testified regarding other incidents involving Duncan that made her feel uncomfortable. E. D. testified that one time Duncan came in her bedroom and touched her pubic hair. Duncan would also kiss her on the mouth and rub against her body so that she could feel his penis. E. D. told her mom about these incidents and her mom replied that they would resolve it within the family. In addition to disclosing to her mother, E. D. also told a friend and her grandfather about the sexual abuse. Regarding physical abuse, E. D. testified that she witnessed Duncan choking V. D. at some point prior to the September 2010 incident.

F. D. testified that on the night of the September 2010 incident, she heard Duncan and her mother arguing because her mother had seen Duncan on top of E. D. E. D. told F. D. that Duncan had put his mouth on her breasts and touched her "privates." F. D. heard Duncan come in her room earlier in the evening but pretended that she was asleep because she was afraid he would touch her inappropriately. Later in the evening, both E. D. and V. D. revealed to F. D. that on other occasions Duncan had come in their rooms and touched them inappropriately.

One time after F. D. was cutting the grass, Duncan approached her, lifted her shirt, and commented that she had "a flat sexy stomach" which would be attractive to boys. On vacation in Florida, Duncan touched her "private" with his finger on top of her bathing suit. On two separate occasions in the car, Duncan rubbed her legs in a manner that made her feel uncomfortable. Additionally, Duncan would hit her and was physically violent with E. D.

V. D. testified that on the night of the September 2010 incident she was in the kitchen doing homework when Duncan inquired as to where E. D. was and stated that he was going upstairs to fix E. D.'s computer. At some point after that, V. D.'s mother asked where Duncan was and after V. D. told her that he was upstairs, her mother went upstairs. After her mother went upstairs, V. D. heard people screaming and

6

decided to go see what was going on. Once upstairs, V. D. saw Duncan on his knees kneeling in front of E. D., who was laying flat on her back. Duncan went downstairs with her mother and, at that point, V. D. sent a text message to her grandmother asking her to come pick the triplets up because E. D. had been molested by Duncan and was scared. While Duncan and her mother were fighting, V. D. heard her mother ask Duncan "[w]hy were you on your knees in E. D.'s bedroom?" E. D. told V. D. that Duncan put his mouth on her breast and "mess[ed] with" her vagina."

Prior to the September 2010 incident, Duncan had touched V. D. inappropriately. The first time, V. D. was in the bed with Duncan and her mother, watching television. Her mother fell asleep and Duncan started rubbing V. D.'s legs. Duncan then began to suck on her toes, touch her bottom, and rub close to her vaginal area. At some point, he touched her vagina and his finger went inside her vagina. Duncan got up to use to the bathroom and V. D. went to her bedroom. Duncan then came into her bedroom and kissed her neck and licked her stomach. Duncan asked V. D. if the way he touched her was okay, and she responded affirmatively because she was scared. Later, Duncan tried to apologize about the incident and gave V. D. flowers and a card that said he was sorry and asked for her forgiveness. The card was admitted as evidence and published to the jury.

While on vacation, Duncan would grab the triplets' bottoms and he took V. D. out to the beach and "grind[ed]" on her. One time, after the vacation, V. D. was in the car with Duncan and he told her that it would be okay if she viewed pornography. Duncan was also physically violent "[a]ll the time." Duncan threw V. D. against the wall and on the floor. Duncan would also hit the triplets.

V. D. told her mother about Duncan's inappropriate touching and her mother responded that V. D. did not know what it was like to have a dad. V. D. also told her grandfather about the sexual abuse while they were fishing.

E. D.'s friend testified that E. D. told her that Duncan touched her breasts and legs and that she woke up to him licking her vagina. E. D.'s friend also explained that she felt uncomfortable on one occasion when she was at E. D.'s home because Duncan said something inappropriate about her legs. The comment "really upset" her, enough so that she told her parents about it.

The triplets' mother testified that Duncan denies all of the allegations and she believes him. The triplets' mother now views her daughters as a "liability."

The grand jury returned an indictment charging Duncan with two counts of aggravated sexual battery, eleven counts of child molestation, aggravated child molestation, incest, and three counts of cruelty to children in the first degree. Duncan

8

was tried by a jury and found guilty of two counts of aggravated sexual battery, aggravated child molestation, incest, nine counts of child molestation, two counts of cruelty to children in the first degree; the trial court merged one of the child molestation counts into one of his two convictions for aggravated sexual battery and the incest count into his conviction for aggravated child molestation. The trial court directed a not guilty verdict as to two of the child molestation counts and the jury acquitted Duncan of one of the cruelty to children counts. Duncan timely filed a motion for new trial, which was denied. Duncan appeals from the denial of his motion for new trial.

1. Duncan contends that his convictions must be reversed because his right to be present at his trial was violated by his absence from a hearing.

On the date of jury selection, prior to conducting voir dire, the trial court heard motions to address some evidentiary issues. The proceedings concluded and the trial court directed the parties to return at noon. At some point after that, the trial court indicated that the case was back on the record and inquired as to Duncan's

9

whereabouts. Duncan's trial counsel stated that Duncan was not present but he was aware of what was taking place and his presence was not necessary.[7]

Thereafter, Duncan's trial counsel explained to the trial court that the guardian ad litem (hereinafter "GAL") from the deprivation case involving the triplets was present with her file. Duncan's trial counsel requested that he have an opportunity to review the file and noted and that he did not believe the State objected to the request. The State confirmed that it did not object to Duncan's trial counsel viewing the file, but was under the impression that the information contained in the file could not be disclosed without the consent of a superior court judge. The trial court ordered that the GAL sit down with counsel for both parties and go over the contents of the file that may be relevant to the case.[8] The trial court clarified that if there was any dispute as to the relevance of anything in the file, the parties could address the issue with the trial court.[9]

---

[7] Both of Duncan's trial attorneys testified at the hearing on his motion for new trial that they did not have authority from Duncan to waive his presence from proceedings.

[8] The trial court issued a written order releasing the file.

[9] We note that the GAL's file is not included in the record.

Duncan argues that his absence from this hearing violated his right to be present under the Georgia Constitution[10] because he could not assist his counsel "with issues relating to this [m]otion hearing, including the review of [the GAL's] file."

The right to be present "exists where there is a reasonably substantial relation to the fullness of opportunity to defend against the charge and to the extent that a fair and just hearing would be thwarted by the defendant's absence." (Citation and punctuation omitted.) *Campbell v. State*, 292 Ga. 766, 770 (4) (740 SE2d 115) (2013). "[T]he constitutional right to be present does not extend to situations where the defendant's presence would be useless, or the benefit but a shadow." (Citation and punctuation omitted). *Heywood v. State*, 292 Ga. 771, 774 (3) (743 SE2d 12) (2013).

The hearing at issue in this case dealt with a purely legal issue. The State did not object to Duncan's trial counsel having access to the GAL's file, yet counsel for both parties felt that the proper procedural mechanism for release of the file, which may have contained privileged information, was for the trial court to release the file. That was the sole purpose of the hearing. Additionally, at the hearing on Duncan's motion for new trial, Duncan's trial counsel acknowledged that he reviewed the

---

[10] Article I, Section I, Paragraph XII of the Georgia Constitution provides, "[n]o person shall be deprived of the right to prosecute or defend, either in person or by an attorney, that person's own cause in any of the courts of this state."

GAL's file and that if it had contained anything exculpatory, he would have done whatever was necessary to admit the exculpatory evidence at trial. At the same hearing, Duncan testified that, at the time of trial, he knew that there was a GAL who may have had evidence but he had "no idea" how to gain access to the file. Moreover, Duncan believed that if his trial counsel had found anything exculpatory in the GAL's file that he would have brought attention to it.

Accordingly, "[s]ince there was not a reasonably substantial relationship between [Duncan's] presence during the discussion of these legal matters and his opportunity to defend against the charges, we conclude that his right to be present during critical stages of his criminal trial was not violated." *Campbell*, 292 Ga. at 770 (4). See id. (defendant's right to be present not violated by his absence from motions hearings, including a motion in limine and motion to suppress, discussing legal matters); see also *Bethune v. State*, 291 Ga. App. 674, 675 (1) (662 SE2d 774) (2008) (defendant's absence from a pre-trial hearing dealing with solely legal matters did not violate his right to be present).

2. Duncan contends that there is a reasonable belief that the jurors convicted him of incest for conduct that was not a crime. Specifically, Duncan argues that because, prior to May 2010, a conviction for incest could not be based on an act of

sodomy[11] and there was testimony at trial that September 2010 was not the first time that sexual contact occurred with E. D., it was possible the jury found Duncan guilty for acts that occurred prior to the change in the law.

However, this contention is moot because although Duncan was found guilty of incest, that count merged into his conviction for aggravated child molestation. *Long v. State*, 287 Ga. 886, 889-890 (2) (700 SE2d 399) (2010). See *Collins v. State*, 327 Ga. App. 590, 592-593 (760 SE2d 606) (2014); *Vergara v. State*, 287 Ga. 194, 196 (1) (b) (695 SE2d 215) (2010).

3. Duncan contends that the State failed to prove venue beyond a reasonable doubt for one of the child molestation counts.

"Venue is a jurisdictional fact that must be proven beyond a reasonable doubt in every criminal trial. While the burden of proving venue rests with the State, the determination whether venue has been established is an issue soundly within the province of the jury." (Citations and punctuation omitted.) *Jones v. State*, 299 Ga. 377, 381 (3) (788 SE2d 477) (2016). "To meet its burden of establishing venue, the State may use both direct and circumstantial evidence." Id.

The count at issue alleged that Duncan,

---

[11] See OCGA § 16-6-22 (a) (2010).

between the 2nd day of August, 2010, and the 11th date of August, 2010, the exact date of the offense being unknown to the Grand Jury in Walton County, Georgia . . . did commit an immoral and indecent act to [F. D.], a child under the age of 16 years, with the intent to arouse and satisfy the sexual desires of himself by touching the stomach of [F. D.] with his hand.

At trial, the State presented evidence that the home the triplets lived in with Duncan was in Walton County. In September 2010, the triplets and Duncan had lived in that home for about five years. At the time of the September 2010 incident, the triplets were 13-years-old. F. D. testified that, when she almost 12-years-old, Duncan would touch her stomach inappropriately and that one of those instances occurred after she and Duncan were cutting grass together. F. D. also described this incident during her forensic interview, which was played to the jury, in which she explained that after she cut the grass with Duncan, they were inside the basement and he touched her stomach. Additionally, Duncan testified that Duncan would come in her bedroom to touch her on her stomach.

Viewing all of the evidence as a whole, we conclude that the evidence was sufficient to prove venue in Walton County beyond a reasonable doubt as to the

challenged child molestation count. See *Jones*, 299 Ga. at 381-382 (3); see also *Hernandez v. State*, 319 Ga. App. 876, 879 (2) (738 SE2d 701) (2013).

4. Duncan contends that his convictions should be reversed because the trial court erroneously permitted extrinsic act evidence. Specifically, he argues that the trial court abused its discretion by finding that Duncan's trial counsel "opened the door" to E. D.'s friend testifying about an incident in which Duncan made her uncomfortable when she was visiting his house. However, this alleged error was not preserved for review.

During an off-the-record bench conference, the trial court found that while cross-examining E. D.'s friend, Duncan's trial counsel opened the door to the State asking her about the incident where she felt uncomfortable around Duncan. There was no objection by Duncan's trial counsel noted in the record.[12] Additionally, Duncan's

_____

[12] Moreover, at the conclusion of E. D.'s friends testimony, the trial court stated that the bench conference "resulted in the defense opening the door with its questioning on cross examination of [E. D.'s friend] about the issue of the statement about legs . . . and the Court ruled that the door had been open to enable the [S]tate to redirect on that incident, and that was what we discussed in that bench conference." After the trial court summarized what took place at the bench conference, Duncan's trial counsel stated "[t]hat's correct" and did not, at any point, note that he had objected.

trial counsel testified at the hearing on Duncan's motion for new trial that while he thought he made an objection, he was "not 100% sure."

"[W]here the transcript or record does not fully disclose what transpired at trial, the burden is on the complaining party to have the record completed in the trial court under the provisions of OCGA § 5-6-41 (f).[13] When this is not done, there is nothing

---

[13]    Where any party contends that the transcript or record does not truly or fully disclose what transpired in the trial court and the parties are unable to agree thereon, the trial court shall set the matter down for a hearing with notice to both parties and resolve the difference so as to make the record conform to the truth. If anything material to either party is omitted from the record on appeal or is misstated therein, the parties by stipulation, or the trial court, either before or after the record is transmitted to the appellate court, on a proper suggestion or of its own initiative, may direct that the omission or misstatement shall be corrected and, if necessary, that a supplemental record shall be certified and transmitted by the clerk of the trial court. The trial court or the appellate court may at any time order the clerk of the trial court to send up any original papers or exhibits in the case, to be returned after final disposition of the appeal.

OCGA § 5-6-41 (f).

16

for the appellate court to review." (Citation and footnote omitted.) *Jackson v. State*, 256 Ga. App. 829, 831 (5) (570 SE2d 40) (2002). Accordingly, because the alleged objection was not noted for the record, this enumerated error is waived. See id.; see also *Pennymon v. State*, 261 Ga. App. 450, 453 (4) (582 SE2d 582) (2003) ("In order to preserve a ground for error, the objecting party must state the specific ground upon which the objection is based. A defendant must do more than merely state that he objects.") (Punctuation and footnote omitted).

5. Duncan contends that his trial counsel was ineffective for failing to object to the State using guilt-assuming hypotheticals in its cross-examination of his character witnesses.

To prevail on an ineffective assistance of counsel claim, Duncan must prove both that his trial counsel's performance was deficient and that he was prejudiced by this deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984).

> To satisfy the first prong of the test, [Duncan] must overcome the strong presumption that his attorney's performance fell within a wide range of reasonable professional conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment; the second prong of the test requires that [Duncan] show there is a reasonable probability

17

that, absent the demonstrated deficient performance, the result of his trial would have been different.

(Citation and punctuation omitted.) *Smiley v. State*, 288 Ga. 635, 637 (2) (706 SE2d 425) (2011). "In reviewing a lower court's determination of a claim of ineffective assistance of counsel, we give deference to the trial court's factual findings, which are upheld on appeal unless clearly erroneous; however, we review the lower court's legal conclusions de novo." (Citation and punctuation omitted.) *Washington v. State*, 276 Ga. 655, 658 (3) (581 SE2d 518) (2003).

Duncan challenges the following exchanges that took place when the State was cross-examining his character witnesses. The first exchange took place while the State was cross-examining two of the triplets' former teacher.

> [THE STATE]: Okay. Would it change your opinion - - and we've talked about you being a mandated reporter. Would it change your opinion about [Duncan's] trustworthiness with children if I were to tell you that he had touched the vagina of [V. D.] on New Year's Eve night? Would that change your opinion?
>
> [TEACHER]: No, because I wouldn't believe it.
>
> [THE STATE]: But if I were to tell you that happened, would that change your opinion?

18

[TEACHER]: No, because I wouldn't believe it. That's not the person I know.

[THE STATE]: Okay. So would it change your opinion - - I understand it's not the person you know. I'm asking you, if it happened, if it, would it change your opinion if I told you [Duncan] had put his mouth on [E. D.'s] vagina? Would that change your opinion of his trustworthiness with children to you?

TEACHER: Well, if there wasn't any evidence or anything like that, I wouldn't believe it because I know how [E. D.] can be.

THE STATE: Okay. Well, you're talking about evidence. You can't actually know any of the evidence in this case; correct?

TEACHER: I'm saying I'd have to see evidence to believe it.

THE STATE: Right. So you haven't seen any evidence in this case. So I'm simply asking you the question, if you take that statement as it is, would that change your opinion?

TEACHER: No, because I don't believe he would do that.

The second exchange took place during the State's cross-examination of Duncan's daughter from a previous marriage.

[THE STATE]: Lastly, you said you would trust [Duncan] with children. You don't have any children, correct?

[DAUGHTER]: No.

[THE STATE]: Okay. You've just been around him yourself?

[DAUGHTER]: Yes.

[THE STATE]: Okay. Would it change your opinion of [Duncan's] trustworthiness with children if I were to tell you that he had put his mouth on [E. D.'s] vagina? Would that change your opinion?

[DAUGHTER]: If I knew, if it was true.

[THE STATE]: If it was true, that would change your opinion?

[DAUGHTER]: I would believe that it would change anybody's opinion.

Duncan's daughter nevertheless testified that she did not believe the triplets' allegations. Additionally, Duncan's daughter testified that she "know[s] my truth by my life with my father. He never showed any of this kind of action or any sign that this would even be possible."

20

"Georgia adopted a new Evidence Code effective January 1, 2013."[14] *Leslie v. State*, 292 Ga. 368, 369 (2) (a), n.3 (738 SE2d 42) (2013).[15] Prior to the adoption of the new evidence code, "it [was] not error to allow the State to pose such a hypothetical question to a character witness on cross-examination." *Roberson v. State*, 214 Ga. App. 208, 211 (9) (447 SE2d 640) (1994). However, Duncan argues that under *U. S. v. Guzman*, 167 F3d 1350, 1352 (III) (11th Cir. 1999), these guilt-assuming hypotheticals are now prohibited. Pretermitting whether Duncan's trial counsel was deficient for failing to object to the hypotheticals,[16] we do not find that Duncan was prejudiced by the alleged deficient performance.

---

[14] "The new Evidence Code applies in cases tried on or after January 1, 2013. [Duncan] was tried in [February 2015], and so, the new Evidence Code applies in this case." (Citation omitted.) *Olds v. State*, 299 Ga. 65, 69 (2), n. 5 (786 SE2d 65) (2016).

[15] "Many provisions of the new Evidence Code were borrowed from the Federal Rules of Evidence, and when we consider the meaning of these provisions, we look to decisions of the federal appellate courts construing and applying the Federal Rules, especially the decisions of the United States Supreme Court and the Eleventh Circuit." *Olds,* 299 Ga. at 69 (2).

[16] We are making no comment regarding whether guilt-assuming hypotheticals are improper under Georgia's new evidence code. See *Jones v. State*, 300 Ga. 543, 550 (4) (796 SE2d 659) (2017) (where our Supreme Court recognized the rule in *Guzman* but found it inapplicable because the questions posed in the case were not guilt-assuming hypotheticals).

In this case, after being asked the guilt-assuming hypotheticals, both witnesses insisted that they did not believe the triplets' allegations. "The harm in allowing the use of this type of [allegedly] improper hypothetical lies in the effect of having the defendant's own character witness assume that the defendant is guilty. Here, the witness[es] essentially refused to accept that assumption." *Guzman*, 167 F.3d. at 1353 (III). Additionally, at the hearing on Duncan's motion for new trial, Duncan's trial counsel testified that as to one of the witnesses, he believed the answer was helpful to his defense. Here, "[t]he government's [allegedly] improper question backfired and, arguably, [Duncan's] case was strengthened by [the witnesses] response[s]." Id. Accordingly, Duncan has failed to show that absent the alleged deficiency, the outcome of his trial would have been different. See id.; see generally *Gipson v. State*, 332 Ga. App. 309, 323 (8) (h) (772 SE2d 402).

6. Duncan contends that his aggravated sexual battery convictions must be reversed because the trial court gave an improper jury instruction. We are constrained to agree.

The trial court instructed the jury that "[a] person commits the offense of aggravated sexual battery when he intentionally penetrates with a foreign object the sexual organ of another person without the consent of that person." See OCGA § 16-

22

6-22.2 (b). The trial court further charged that "[c]onsiderations of consent and force are irrelevant in . . . aggravated sexual battery cases against children under 16 years of age, for children under the age of 16 years are legally incapable of consenting to illicit sexual acts."

"Although the charge was a correct statement of the law at the time it was given, following the trial, the Supreme Court of Georgia held that the crime of sexual battery requires actual proof of the victim's lack of consent, regardless of the victim's age." (Citation and punctuation omitted.) *Laster v. State*, 340 Ga. App. 96, 100 (2) (796 SE2d 484) (2017); see *Watson v. State*, 297 Ga. 718, 720 (2) (777 S.E.2d 677) (2015).

> Thus, the *Watson* Court determined that it is erroneous for a trial court to instruct a jury that an underage victim is not capable of consenting to contact constituting sexual battery.[17] The instant case was in the appellate "pipeline" at the time *Watson* was decided and, consequently, the *Watson* holding governs our analysis. We therefore must determine

___

[17] In *Watson,* our Supreme Court recognized that "sexual battery as defined in our Code does not necessarily involve sexual conduct." *Watson*, 297 Ga. at 721 (2). The same holds true for aggravated sexual battery. Aggravated sexual battery could encompass innocent conduct, such as "a physician's [vaginal] examination on a 15-year-old patient." Id. at 720 (2). Accordingly, we extend the holding of *Watson* to cases involving aggravated sexual battery.

23

whether the charge was harmless, i.e., whether it is highly probable that the erroneous charge did not contribute to the jury's verdict.

(Citations omitted.) *Laster*, 340 Ga. App. at 100 (2).[18]

"Because the erroneous jury instruction here effectively relieved the State of its burden to prove an essential element of the crime of [aggravated] sexual battery, the instruction cannot be said to have been harmless. Accordingly, [Duncan's] convictions for [aggravated] sexual battery must be reversed." *Watson*, 297 Ga. at 721 (2); see *Laster*, 240 Ga. App. at 100 (2).

7. Duncan contends that he must be re-sentenced on his child molestation convictions because the trial court's sentences are illegal and void. Specifically, Duncan argues that pursuant to *New v. State*, 327 Ga. App. 87, 106-109 (5) (755 SE2d 568) (2014), his sentence is void because the trial court failed to impose a split

---

[18] We reject the State's contention that plain error review applies. See *Watson*, 297 Ga. at 721 (2); cf. *Hammond v. State*, 289 Ga. 142, 144 (2) (710 SE2d 124) (2011) (applying the "highly probable" test to determine whether the failure to charge the jury as to the rule in *Garza v. State*, 284 Ga. 696 (670 SE2d 73) (2008) was harmless).

sentence as to each of his child molestation convictions as required by OCGA § 17-10-6.2 (b).[19] The State agrees.

As to Duncan's convictions for child molestation, "because the trial court failed to sentence [Duncan] in accordance with OCGA § 17-10-6.2 (b), we must vacate [Duncan's] sentence[s] and remand to the trial court for resentencing consistent with the mandates of that Code section." *New*, 327 Ga. App. at 109 (5).

*Judgment affirmed in part and reversed in part and case remanded. Ellington, P. J., and Andrews, J., concur.*

---

[19] "[A]ny person convicted of a sexual offense shall be sentenced to a split sentence which shall include the minimum term of imprisonment specified in the Code section applicable to the offense." OCGA § 17-10-6.2 (b).