## A04A1063. CURRINGTON v. THE STATE.
### (606 SE2d 619)

PHIPPS, Judge.

A jury found Herbert Wayne Currington guilty of two counts of rape, two counts of incest, and two counts of cruelty to children. After Currington moved for a new trial, the court merged his convictions for rape and incest but refused to merge the convictions for cruelty to children into the ones for rape. In this appeal, Currington contends that the trial court erred by (1) depriving him of his confrontation right, (2) failing to merge his convictions for rape and cruelty to children, (3) denying his request for a continuance, and (4) admitting hearsay evidence. Because these claims do not require reversal, we affirm.

---

[1] *Jones v. State,* 265 Ga. App. 97, 100 (4) (592 SE2d 888) (2004).
[2] *Matheson v. State,* 249 Ga. App. 200, 201 (1) (547 SE2d 774) (2001).

When viewed in the light most favorable to the verdict, the evidence established that Currington is the father of the victim, J. C., who was then living with her mother, Currington's former wife. Shortly after exiting a school bus at Currington's house, J. C., age 14, accompanied Currington, her stepmother, and her two younger stepbrothers to a pool hall nearby. While shooting pool, Currington consumed four or five beers. After an hour or so, Currington, J. C., and the others left the pool hall and stopped at a convenience store so Currington could purchase more beer. At about 7:00 p.m. they arrived back at Currington's house. At that point, J. C. realized that she was late in getting home and telephoned her mother, telling her that she would be home "in a few minutes." The two or three-mile drive to her mother's house normally took about five minutes. J. C. told her father that her stepbrothers wanted to come along too, but Currington refused to allow them to do so.

While on route to his ex-wife's house alone with J. C., Currington suddenly said, "I'm going to show you how sex is." He touched her "private part" with his hand. J. C. pushed her father's hand away and told him that she wanted to go home. Currington then stopped in the driveway of a vacant house, where he forcibly removed J. C. from the car, "threw" her against the side of the car, pulled her pants down, and raped her. After raping her, Currington resumed driving but stopped again, this time on a dirt side road. A cable obstructed the dirt road and Currington directed his daughter to lift the cable while he drove beneath it. After driving into a remote area approximately 50 to 75 yards back in the woods, Currington yanked his daughter from the passenger seat and "threw" her into the back seat. Over her protests and despite her resistance, Currington forced her to have vaginal intercourse a second time. She testified that her father grabbed her so hard that he "hurt my arm."

Currington and J. C. arrived at her mother's home at approximately 8:00 p.m. By his own admission at trial, the trip had taken about 45 minutes. Currington warned his daughter not to tell anyone what had happened. Noticing that J. C. had a bloody lip and was shaking, her mother asked her what was wrong. She said, "Mamma, daddy made me have sex with him." Describing herself as becoming "unglued" by her daughter's disclosures, she took J. C. to the police department. J. C. went by ambulance to a nearby hospital.

Dr. Dianne Dodgen examined J. C. at the hospital. Dodgen testified, "I found that she had some tenderness in the left, upper quadrant of her abdomen and that she had some contusions, some internal abrasions and some contusions to the genital area." Dodgen noted that J. C.'s hymen was torn and there was some bleeding. Based on the tenderness of the girl's left ovary and the internal abrasions, Dodgen felt that penetration of the vaginal area could have been

deep. Dodgen testified that J. C.'s symptoms were consistent with "forcible" vaginal penetration.

Special Agent Chris Hosey of the Georgia Bureau of Investigation (GBI) interviewed J. C. at the hospital. She told Hosey about going to the pool hall with Currington and about Currington giving her a ride home. She described where and how Currington had sexually assaulted her two separate times on the way home. Several hours later, Hosey went to Currington's house where he read a consent form and obtained Currington's permission to search his car parked in the yard. Pubic hairs were obtained from Currington to compare with the ones that Hosey removed from the back seat of the car. Scientific testing determined that the pubic hair samples from Currington matched the hairs removed from the back seat of the car.

Taylor County Sheriff Nick Giles testified that when his staff notified him about the reported rape, he went to Currington's house to speak with him that night. Giles described Currington as "[v]ery intoxicated." Currington denied engaging in any sexual activity with his daughter but told the sheriff that he had taken her down a remote road blocked by a cable, where he had her raise the cable, then had driven back into the woods to discuss sexual diseases with her. Realizing the similarities in the young girl's account and Currington's, Giles returned to his office and contacted the GBI. In the isolated area past the cable and well into the woods, investigators found "fresh" beer cans and saw tire tracks that appeared to match the tire tread on Currington's car.

After the incident, J. C. suffered from nightmares, had difficulty sleeping, and stayed in a constant state of fear. Her mother testified that she needed psychiatric treatment. The clinical psychologist who was providing regular treatment to J. C. testified that J. C.'s symptoms were consistent with a child who has been sexually assaulted.

Currington's wife testified that after Currington was gone so long, she had become worried about the possibility of car trouble and had called J. C.'s mother to see whether they had arrived there. His wife testified that Currington left home with J. C. at 7:15 or 7:20 and did not return until 8:10 or 8:15 p.m.

The defense presented the testimony of 17 witnesses including Currington. The thrust of the defense was three-fold: that Currington was a person of good character; that he was the victim of a conspiracy concocted by his former wife to implicate him in nonexistent crimes; and that J. C. had been upset and angry because he would not allow her to have a relationship with a certain young man. The jury found Currington guilty on all counts.

1. Currington contends that the trial court deprived him of his right of confrontation by denying him the ability to present direct and

relevant testimony. He claims that his defense was hampered because he was not permitted to elicit testimony to show that his ex-wife was biased and had reason to seek revenge against him for reporting her affair with a married man. He asserts that such evidence was necessary and relevant "to show that the mother influenced her daughter into fabricating the story of the rapes."

The record belies these assertions. Currington was not precluded from introducing such evidence, although he was limited in doing so. During the cross-examination of Currington's ex-wife, the defense questioned her about her relationship with "R. T." After she denied dating R. T. and testified that he had not given her money, defense counsel asked her, "Was there a time when [R. T.] was providing you with money that you used to pay for your car and house —." At that point the state objected on the basis of the relevancy of this line of questioning. After the trial court said, "Let's move on," Currington neither objected nor sought a mistrial. Another defense witness, Currington's cousin, testified that she knew R. T. as the boyfriend of Currington's ex-wife. The state again objected to the relevancy of the social life of the victim's mother. After the court found that the issue was irrelevant, defense counsel neither objected nor moved for a mistrial.

Later, when Currington was asked to explain why he and his ex-wife did not socialize, Currington testified, "Because of [R. T.]" When asked whether he and his former wife had gotten along well, Currington responded, "We used to up to [R. T.] stepped into the picture." He claimed that he did not like his ex-wife dating a married man "in front of my children." Currington testified, "I called [R. T.'s wife] and told her what was going on. I told her her husband was running around with my ex-wife." When Currington was asked, "What problems did that cause?" the state objected to the continuation of this line of questioning. After the trial court found such inquiry irrelevant, Currington protested that his defense was being limited and the court noted his exception. After Currington asked for clarification, the trial court responded that he could explore Currington's relationship with his ex-wife but that "he cannot go into what you were going into." After that ruling, Currington neither objected nor moved for a mistrial.

Immediately after the court's ruling, however, defense counsel asked, "Is there any reason why [your ex-wife] would lie as far as this is concerned?" Currington responded, "Because she's hot at me about [R. T.]" When the state protested, "that's a continuation of the same," the trial court agreed, saying, "Let's move on." Again, Currington did not object or seek a mistrial. Then, during cross-examination, when asked to explain his daughter's actions and her psychological trauma, Currington again said, "I was — it was set up because of [R. T.]"

Currington also testified, "Because I reported it to his wife . . . [R. T.] came to my house and told me that he would get me one way or the other."

Thus, even though the state objected to the relevancy of testimony about the social life of Currington's former wife, the jury heard such testimony, including Currington's beliefs about revenge, conspiracy, and the fabrication of the allegations. That evidence was placed before the jury and the jury was never instructed to disregard any of it. In any event, even had restricting this line of inquiry been error, in light of the overwhelming evidence of Currington's guilt, it is highly probable that such error did not contribute to the verdict.[1]

2. Currington contends that the trial court erred in sentencing him because the same facts were used to prove rape and cruelty to children. He asserts that these convictions should have been merged.

By definition, "Any person commits the offense of cruelty to children in the first degree when such person maliciously causes a child under the age of 18 cruel or excessive physical or mental pain."[2] In pertinent part, Counts 5 and 6 charged Currington with cruelty to children in that he did "maliciously cause [J. C.], a child under the age of eighteen (18), cruel and [sic] excessive mental pain, by raping the said [J. C.], contrary to the laws of said State. . . ." Thus, as indicted here, the state had to prove: (1) Currington maliciously caused J. C. excessive mental pain; (2) by raping her; and (3) when she was under age 18.[3]

J. C.'s mother testified about her daughter's nightmares and emotional problems. J. C.'s psychologist testified about J. C.'s continuing need for medical treatment for depression and about her excessive anxiety, insomnia, fearfulness, and worry. Other evidence established her age as under 18. Thus, as a matter of fact, the crimes of rape and child cruelty constituted separate offenses.[4] Therefore, the cruelty to children counts did not merge into the rape counts and Currington was not punished twice for the same misconduct.[5]

3. Currington asserts that the trial court erred by denying his request for a continuance. He claims that Uniform Superior Court Rule (USCR) 32.1 requires a minimum of seven days' notice before the date set for the trial and that he was not afforded proper notice. He argues that because USCR 32.1 does not specify how to calculate the days, the general law applies and under OCGA § 1-3-1, the first

---

[1] See *Woodward v. State*, 262 Ga. App. 363, 367 (2) (585 SE2d 687) (2003).
[2] OCGA § 16-5-70 (b).
[3] See *Starnes v. State*, 205 Ga. App. 882, 884 (2) (424 SE2d 4) (1992).
[4] See *Ranalli v. State*, 197 Ga. App. 360, 363-364 (2) (b) (398 SE2d 420) (1990).
[5] See id.; see also OCGA § 16-1-7 (a).

day is not counted. He also contends that because the notice was mailed, three additional days should have been added pursuant to OCGA § 9-11-6 (e).

At the call of the case, Currington's trial counsel indicated that he had not received proper notice of the trial to allow him to prepare sufficiently. Trial counsel had entered his appearance on behalf of Currington on June 18, 1993, and the trial was set for October 25, 1993.[6] He asked the court to delay the trial, claiming, "This notice of hearing is vastly inadequate, therefore, his preparation as far as the trial is concerned is going to be less than I would normally like to do and we have other people we need to discuss the case with." Noting "this case was on the criminal docket last term of court and passed," the trial court found that "[t]he fact that the notice was late, I think that's not grounds for a continuance."

"Whether to grant a motion for continuance is entirely within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion."[7] Here, the trial court did not clearly abuse that discretion. As the notice was mailed on October 19 and the trial was set for October 25, it would seem that the notice did not comply with USCR 32.1. Even so, noncompliance with USCR 32.1 "is to be assessed under the circumstances of each case."[8]

At the hearing on his motion for new trial, Currington did not call trial counsel as a witness. Currington offered no evidence that trial counsel had not been able to discuss the case with the "other people we need" or that he had not been able to prepare adequately for trial. We note, however, that the trial occurred in October 1993, and the hearing on the motion for new trial did not take place until December 2003. When there is no showing that a continuance would have benefitted the defendant, he has not established harm in the denial of the continuance.[9] So, in the absence of a proffer of his trial counsel's testimony or other evidence to support this claim, Currington failed to show that the trial court clearly abused its discretion in denying the continuance.[10] The record is silent on whether trial counsel was unavailable to appear at the motion hearing.

Currington's motion for new trial was timely filed on November 23, 1993. The transcript was complete as of December 17, 1993, and a rule nisi set a hearing date for February 21, 1994. The motion

---

[6] There was a ten-year delay between the timely filing of Currington's motion for new trial and the hearing on that motion, which is addressed infra in this division.

[7] (Citation omitted.) *Greene v. State*, 274 Ga. 220, 221 (3) (552 SE2d 834) (2001).

[8] (Citation and punctuation omitted.) *Payne v. State*, 195 Ga. App. 523, 524 (1) (394 SE2d 781) (1990).

[9] *Woodward*, supra, 262 Ga. App. at 366-367 (2).

[10] See *Johnson v. State*, 275 Ga. 650, 652-653 (5) (571 SE2d 782) (2002).

hearing did not take place until December 18, 2003. The ten-year delay between the filing of the motion for new trial and the hearing on the merits of that motion is troubling. The role of counsel in seeking post-conviction relief is a fundamental component of our criminal appellate system.[11] At the motion hearing, Currington's prior appellate counsel attributed the delay to a mutual decision to forego pursuing an appeal and to seek early release instead, based on Currington's age and health problems. Although counsel stated his opinion that this decision was made with Currington's concurrence, Currington denied having any discussion about abandoning his appeal. Regardless of the reason, ten years is too long a delay for conducting a hearing on a motion that must be filed within thirty days of judgment.[12] The passage of time increases the likelihood that witnesses will be unavailable, evidence lost and memories faded. The courts have a duty to oversee the criminal justice system[13] and the state bears a responsibility of ensuring that criminal cases are resolved expeditiously.[14] "The judicial branch, prosecutors, and the criminal defense bar all have a duty to meet their respective responsibilities in ensuring that criminal cases are promptly resolved."[15] For all of these reasons, a motion for new trial requires expeditious adjudication, not interminable delay. Finality is important to all concerned in the criminal justice system.

4. Currington contends that the trial court erred by admitting over his objection the hearsay testimony of Hosey, one of the GBI agents who testified at trial. He claims that the Child Hearsay Statute did not apply.[16]

J. C. was not a child under the age of 14 when she made the statement at issue, so the Child Hearsay Statute was inapplicable.[17] Even so, erroneously admitted testimony that is merely cumulative of properly admitted testimony may be deemed harmless.[18] Before Hosey testified, J. C. had already given substantially the same testimony about the events of that night. Any error in allowing Hosey's testimony about what J. C. told him was therefore harmless.[19]

*Judgment affirmed. Smith, C. J., and Johnson, P. J., concur.*

---

[11] *Spradlin v. State*, 262 Ga. App. 897, 903 (587 SE2d 155) (2003).

[12] *Reynolds v. State*, 267 Ga. App. 148, 150-151 (598 SE2d 868) (2004).

[13] *Stone v. State*, 257 Ga. App. 306, 307 (570 SE2d 715) (2002).

[14] See *Spradlin*, supra, 262 Ga. App. at 900.

[15] *Stone*, supra, 257 Ga. App. at 307.

[16] See OCGA § 24-3-16.

[17] See *Darden v. State*, 206 Ga. App. 400, 401 (1) (425 SE2d 409) (1992).

[18] See *Starks v. State*, 266 Ga. 547, 549 (468 SE2d 376) (1996).

[19] See *Jones v. State*, 265 Ga. 84, 86 (4) (453 SE2d 716) (1995).

*William P. Nash, Jr.*, for appellant.
*J. Gray Conger, District Attorney*, for appellee.