**FOURTH DIVISION**
**DOYLE, P. J.,**
**COOMER and MARKLE, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**February 5, 2020**

# In the Court of Appeals of Georgia

A19A2455. HAMBRICK v. THE STATE.

MARKLE, Judge.

Following a jury trial, Jason Hambrick was convicted of rape (OCGA § 16-6-1); two counts of aggravated child molestation (OCGA § 16-6-4); incest (OCGA § 16-6-22) (2010); and cruelty to children (OCGA § 16-5-70). He now appeals from the trial court's denial of his motion for new trial, arguing that (1) the State violated the discovery rules when it failed to turn over an additional medical report from its expert, and the trial court erred in failing to grant a continuance in light of the discovery violation; (2) he received ineffective assistance of counsel due to (a) the failure to seek a continuance or properly investigate the medical evidence, and (b) the failure to object to hearsay testimony concerning another doctor's examination; (3) the trial court erred in limiting the testimony of his expert; (4) the trial court

improperly allowed hearsay evidence about a DNA test; (5) the State failed to prove

venue with regard to three of the charges; (6) the trial court erred in refusing to merge

the rape and cruelty to children convictions; and (7) the trial court's written sentence

conflicted with the oral sentence imposed.[1] After a thorough review of the record, and

for the reasons that follow, we affirm the denial of the motion for new trial, but

remand the case for correction of a scrivener's error in the sentencing sheet.

Viewing the evidence in the light most favorable to the jury's verdict, *Jackson*

*v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979), the record shows that

when D. H. was two years old, she was living with her mother and her step-father,

Hambrick. They lived in an apartment in Vine City for about a year before moving

in with D. H.'s grandfather and his wife in Alpharetta. While they lived with the

grandfather, the mother worked and Hambrick took care of D. H. During this time,

---

[1] The trial court initially sentenced Hambrick to a total of 220 years' imprisonment, with no term of probation. Although the trial court denied the motions for new trial on the merits, it resentenced Hambrick to impose a split sentence on the rape, aggravated child molestation, and incest counts, as required under OCGA § 17-10-6.2. The revised sentence, imposed on January 25, 2019, was 219 years' imprisonment with life on probation. The written judgment indicated that Hambrick was sentenced to consecutive terms of 50 years' imprisonment on each count of rape and aggravated child molestation, and another consecutive term of 50 years to serve 49 on the incest conviction.

D. H. often complained of pain and would cry when having a bowel movement, and the family thought that D. H. was constipated.

According to D. H., the abuse started when the family lived in Vine City, but it continued after they moved into the grandfather's house in Alpharetta. She said that while she was living in Vine City, her "daddy put his penis in [her] butt" more than one time, and she was afraid to tell anyone. She also said that it happened more than one time while she was living with her grandfather in Alpharetta. D. H. further stated Hambrick placed his penis in her vagina and her mouth more than one time, that it hurt, and that she would cry.

One weekend around the end of July 2011, D. H. was playing at her great-grandparents house when her great-grandmother noticed her humping a pillow. The great-grandmother told her to stop, and D. H. said that's "the way my daddy do when he puts his penis in my butt." The great-grandmother asked her what she was talking about, and D. H. repeated that Hambrick would place his penis in her butt. D. H. repeated the disclosure to her great-grandfather and her grandmother, and also stated that Hambrick would cover her mouth with tape when she cried.[2] The following

---

[2] A later search of Hambrick's home uncovered black electrical-type tape consistent with the type D. H. alleged Hambrick used to cover her mouth.

morning, D. H.'s great-grandparents took her to the hospital. During an examination, D. H. informed the doctors that Hambrick placed his penis in her vagina as well.[3] Based on these allegations, Hambrick was indicted for rape, two counts of aggravated child molestation, incest, and cruelty to children.

At trial, Dr. Ziegler, the attending physician who first examined D. H. at the hospital, testified that he observed some discoloration and redness along the labia that indicated possible bruising. There was also some discoloration of the hymen, which could have indicated a tear that had healed. He further noted some discoloration and disruption along the anus, for example the skin was not intact, which he explained could be consistent with something penetrating the anus. Ziegler opined that these findings were consistent with the allegations of molestation and abuse. He noted, however, that the genital area heals very quickly, which could explain why there were no other indications or abnormal findings. Nevertheless, he confirmed that he did not

---

[3] The great-grandmother also testified that, about eleven months before this incident, she noticed D. H. playing with a doll, taking her fingers and pretending to spread the doll's vagina. She explained that D. H. would cry when her great-grandparents brought her home or when Hambrick would come to the great-grandparents's house to pick her up. D. H.'s grandmother testified that she once observed D. H. place a toy between her legs, straddling it, and lean over like she was kissing the floor.

consider the results of D. H.'s examination normal, and accordingly, he recommended that she be seen for a more thorough forensic examination.

A social worker conducted a forensic interview, which was recorded and played for the jury. In the interview, D. H. explained that Hambrick put his penis in her vagina, butt, and mouth on more than one occasion, and that this occurred while they were living in her grandfather's house. D. H. stated that it hurt when Hambrick did this, and she used dolls to show the examiner how she was positioned when Hambrick abused her. The social worker testified that she saw no signs that D. H. had been coached or had fabricated the allegations, noting that D. H. was able to describe the position of her body, what she was wearing, where she was in the room, and how it felt.

Dr. Guidry testified that she was a nurse practitioner working with children of sexual abuse.[4] She physically examined D. H. on three occasions beginning a few days after D. H. was seen in the emergency room. After reviewing the records from the emergency room examination, she testified that the bruising on the labia indicated some blunt force trauma, and the injury on the hymen was consistent with sexual

---

[4] Dr. Guidry explained that she had obtained a Ph.D in nursing.

5

abuse. She noted that there was no report of any previous accident or trauma that would otherwise explain those injuries. Dr. Guidry stated that, when she examined and spoke to D. H., the child told her that Hambrick put his penis in her vagina, butt, and mouth. On physical examination, however, Guidry did not observe any visible injury to the labia and hymen, although she explained that it would not be unusual for the injuries to have healed by then. When she examined the anus, she observed what appeared to be a tear and an injury, which could explain the painful bowel movements that D. H. experienced. Dr. Guidry acknowledged that the tear could be the result of trauma or constipation, but she opined that it was consistent with D. H.'s allegations and "[was] highly suspicious for sexual abuse," rather than constipation, because all reports indicated that D. H.'s stool was soft.

Dr. Guidry further testified that she re-examined D. H. two more times after the initial examination. In these examinations, she noted that there were no new complaints of pain when D. H. used the bathroom, but there remained some redness in the vaginal area. She opined that this could be the result of poor hygiene or friction from clothing, or it could have been a normal variation. The scar that had been visible on earlier examination had healed, and the redness around the anus was gone.

The defense called Dr. Tillitski, a licensed psychologist, in rebuttal. Dr. Tillitski criticized the manner in which the social worker conducted D. H.'s forensic interview. He noted that she used specific questions that were not neutral and which increased the risk of fabrication; that D. H. denied any abuse numerous times before affirming anything happened; the interviewer did not use questions designed to elicit a narrative; and the interviewer touched the dolls instead of letting D. H. demonstrate with them. He further opined that the interviewer allowed the interview to go on too long, and that D. H. did not allege any abuse until more than 20 minutes into the interview. He expressed concern that D. H. only received positive responses from the interviewer when she confirmed the allegations of abuse.

The jury convicted Hambrick of all counts. Thereafter, Hambrick filed a motion for new trial, which he twice amended. Following a hearing, at which trial counsel and a medical expert testified, the trial court denied the motion, but resentenced Hambrick to a term of imprisonment followed by probation, as required by OCGA § 17-10-6.2. Hambrick now appeals.

1. In his first enumeration of error, Hambrick argues that the State violated the discovery statutes by failing to turn over Dr. Guidry's two follow-up examination reports prior to trial, and the trial court failed to remedy this violation when it did not

7

grant a continuance to give counsel time to review the records and hire an expert to dispute them. This argument is without merit.

Under OCGA § 17-16-4 (a) (4), the State is required to turn over all expert reports prior to trial.[5] To remedy an alleged violation of this statute,

> [i]f at any time during the course of the proceedings it is brought to the attention of the court that the state has failed to comply with the requirements of this article, the court may order the state to permit the discovery or inspection, interview of the witness, grant a continuance, or, upon a showing of prejudice and bad faith, prohibit the state from introducing the evidence not disclosed or presenting the witness not disclosed, or may enter such other order as it deems just under the circumstances.

OCGA § 17-16-6. We review the trial court's remedy for a discovery violation for abuse of discretion. *Tubbs v. State*, 276 Ga. 751, 753-754 (3) (583 SE2d 853) (2003).

In this case, before the jury was brought in on the second day of trial, Hambrick's counsel alerted the court that, the day before, the State had turned over the medical records from Dr. Guidry's two follow-up examinations and counsel had not had the chance to review them. Trial counsel acknowledged that the State had

---

[5] Hambrick elected to have the discovery provisions apply. See OCGA § 17-16-2 (a).

only received the records the day before and had provided them to defense counsel immediately. The State clarified that it was not seeking to admit the additional medical records, just the doctor's testimony about the follow-up examinations. Trial counsel then argued that the doctor should not be allowed to testify to the ultimate issue in the case – that is, whether sexual abuse occurred. The trial court agreed to give counsel time to review the records, but noted that none of the testimony was a surprise, as it was cumulative to what had already been admitted, and defense counsel had been aware of the follow-up examinations from the initial discovery.

At the hearing on the motion for new trial, trial counsel testified that she had objected to the discovery violation and requested that the records be excluded, but she conceded that she did not specifically move for a continuance to review the records. She argued that these new records referred to injuries consistent with abuse, which differed from the other medical testimony already given. She admitted, however, that if the information about the subsequent examinations was part of discovery the State initially provided, she would have been aware of the follow-up examinations.

We cannot say that the trial court abused its discretion here. First, we note that, although trial counsel objected to the records and testimony, counsel did *not* move for a continuance. Notably, Hambrick complains only of the testimony referencing

9

the follow-up examinations, and not Dr. Guidry's initial findings. But Dr. Guidry's testimony about these follow-up examinations was generally consistent with her initial testimony, and trial counsel was able to cross-examine Dr. Guidry as to any inconsistencies. Because trial counsel did not request a continuance and has not shown that Hambrick was prejudiced by the alleged discovery violation, this alleged error does not require relief. *Murray v. State*, 293 Ga. App. 516, 518-519 (2) (667 SE2d 382) (2008).

Moreover, the record reflects that the trial court gave trial counsel additional time to review the records, noting that Dr. Guidry's testimony about the follow-up examinations should not have been a surprise given that the records were already produced in discovery. See *Cushenberry v. State*, 300 Ga. 190, 195 (2) (c) (794 SE2d 165) (2016) (trial court's remedy of giving trial counsel time to review records was not an abuse of discretion where the expert's allegations were not a surprise and did not alter the defense theory). Accordingly, we conclude that there was no abuse of discretion, and a new trial was not warranted on this basis.

2. Hambrick next argues that he received ineffective assistance of counsel due to counsel's failure to (a) seek a continuance or investigate the new medical evidence in Dr. Guidry's second report, and (b) object to hearsay testimony from one of the

10

police officers.[6] He contends that he was prejudiced by counsel's deficient performance, and that the additional report was not cumulative of other evidence. We disagree.

> To succeed on a claim that counsel was constitutionally ineffective, [Hambrick] must show both that his attorney's performance was deficient, and that he was prejudiced as a result. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). Under the first prong of this test, counsel's performance will be found deficient only if it was objectively unreasonable under the circumstances and in light of prevailing professional norms. And under the second prong, prejudice is demonstrated only where there is a reasonable probability that, absent counsel's errors, the result of the trial would have been different. A "reasonable probability" is defined as a probability sufficient to undermine confidence in the outcome. Failure to satisfy either prong of the *Strickland* test is sufficient to defeat a claim of ineffective assistance, and it is not incumbent upon this Court to examine the other prong. And although both the performance and prejudice components of an ineffectiveness inquiry involve mixed questions of law and fact, a trial court's factual findings made in the course of deciding an ineffective assistance of counsel claim will be affirmed by the reviewing court unless clearly erroneous.

---

[6] The trial occurred in 2013 and, therefore, our new Evidence Code applied. *Parker v. State*, 296 Ga. 586, 588 (1) (769 SE2d 329) (2015).

(Citations and punctuation omitted.) *Green v. State*, 302 Ga. 816, 817-818 (2) (809 SE2d 738) (2018). With these standards in mind, we turn to Hambrick's claims of ineffective assistance of counsel.

a. Failure to seek continuance and investigate medical records

Hambrick contends that trial counsel was deficient in failing to request a continuance and to investigate the medical records because, if he had been given time to review the report, he would have submitted rebuttal expert testimony from Dr. Ingram-Jones. We are not persuaded.

At the motion for new trial hearing, Dr. Ingram-Jones, a pediatric nurse practitioner and pediatric medical forensic examiner, testified as an expert in the field of forensic sexual assault and abuse. Dr. Ingram-Jones criticized Dr. Guidry's lack of knowledge of D. H.'s medical history, as well as Dr. Guidry's failure to follow up regarding the alleged constipation. She noted that Dr. Ziegler found redness on the labia and discoloration on the hymen, as well as eczema, but Dr. Guidry saw none of these things a few days later. Instead, Dr. Guidry noted an anal tear and scarring not found in Dr. Ziegler's examination. Dr. Ingram-Jones opined that Dr. Ziegler would have been able to see such a scar like this one without the use of special equipment.

12

Moreover, Dr. Ziegler did not identify any injury as acute, whereas Dr. Guidry considered the anal tear to be an acute injury.

Dr. Ingram-Jones further testified that the abnormality along the anus could have been a normal variation and did not appear to be an injury. Dr. Ingram-Jones acknowledged that Dr. Guidry's notes referenced the alleged injury as a possible normal variation. Dr. Ingram-Jones opined that constipation could explain the anal tearing, and she described this information about possible constipation, which Dr. Guidry ignored, as a "game-changer." She admitted, however, that Dr. Ziegler noted that the child's stomach was supple and there were normal bowel sounds. Dr. Ingram-Jones identified reasons for the discoloration of the hymen and the redness around the labia that would be expected of a child, such as potty training or poor hygiene. Dr. Ingram-Jones admitted, however, that she did not review any information from the family regarding constipation, did not have the digital photos of the exam and reviewed only the copies, which she acknowledged did not give a clear view, and had no knowledge of whether D. H. was potty trained. According to Dr. Ingram-Jones, the only finding here that would have been a concern for her was the discoloration of the hymen.

Hambrick has not shown how he was prejudiced by trial counsel's failure to request a continuance because Dr. Ingram-Jones's testimony was cumulative of the other medical testimony admitted. Moreover, the evidence against Hambrick was strong, and trial counsel conducted a thorough cross-examination of Dr. Guidry, eliciting testimony that constipation was one possible cause of the anal tearing and that the redness could be a normal variation or the result of poor hygiene as opposed to molestation.[7] *Sanchious v. State*, 351 Ga. App. 611, 620-621 (2) (d) (831 SE2d 843) (2019) (defendant did not establish prejudice where he failed to show that proffered expert's testimony was different or more favorable than testimony obtained at trial); *Cobb v. State*, 348 Ga. App. 210, 215 (2) (b) (820 SE2d 241) (2018) (no showing of ineffective assistance of counsel where cross-examination of State's expert resulted in similar testimony to that proffered by the defense's expert). Notably, Dr. Ingram-Jones admitted that the discoloration of the hymen was a cause for concern. In this manner, as the trial court correctly found, Ingram-Jones's testimony would have been cumulative, and the failure to call an expert witness

---

[7] We note that one of the alleged inconsistencies Hambrick complains of is Dr. Guidry's testimony that the anal injury was acute. But this testimony did not come out in direct examination; rather, trial counsel asked Dr. Guidry on cross-examination if she would consider the anal injury acute, to which the doctor responded yes.

14

whose testimony was cumulative cannot establish the prejudice prong of an ineffective assistance of counsel claim. See *Rolland v. State*, 321 Ga. App. 661, 668 (3) (a) (742 SE2d 482) (2013); see also *Gomez v. State*, 301 Ga. 445, 457-458 (5) (801 SE2d 847) (2017) (defendant failed to show prejudice from trial counsel's failure to present expert testimony in rebuttal where expert never examined victim, gave equivocal findings, was not an expert in the field, and the trial court, which heard the testimony at the new trial hearing, did not find expert credible). Accordingly, this claim of error fails.

b. Hearsay evidence

Hambrick next argues that he received ineffective assistance of counsel when trial counsel failed to object to a police officer's testimony because such testimony was hearsay and violated the Confrontation Clause. But Hambrick has not shown that he was prejudiced.

At trial, an investigating officer with the Johns Creek police department testified that a medical resident who examined D. H. along with Dr. Ziegler told him that she had examined D. H. and noted bruising on D. H.'s labia, as well as discoloration and marking around the anus. At the hearing on the motion for new

trial, trial counsel testified that she should have objected to the testimony on hearsay grounds if the resident had not already testified.

Although the resident did not testify at trial, the record is clear that Dr. Ziegler, who did testify at trial, made the same observations. Accordingly, the hearsay testimony was cumulative of properly admitted testimony, and any error in allowing it was harmless. *Sanchious*, 351 Ga. App. at 616 (1) (b). As a result, Hambrick cannot show that he was prejudiced by counsel's performance. For this same reason, Hambrick's challenge on Confrontation Clause grounds also fails. *Jackson v. State*, 350 Ga. App. 80, 81 (2) (827 SE2d 919) (2019) ("When hearsay evidence is erroneously admitted in violation of the confrontation clause, such an error of constitutional magnitude can be harmless when the evidence at issue is cumulative of other properly admitted evidence or when the evidence against the defendant is overwhelming.") (citation and punctuation omitted).

3. In his third argument, Hambrick contends that the trial court improperly limited the testimony of his expert, Dr. Tillitski, because the testimony was permissible under OCGA §§ 24-6-620 and 24-7-702. He contends that the trial court prevented his expert from testifying about the disclosure because it was based on hearsay and went to the ultimate issue in the case. He notes that an expert may base

his opinions on hearsay evidence, and that the trial court did not limit the State's experts in the same manner.

We review a trial court's ruling on the admissibility of expert testimony for abuse of discretion. *Haynes v. State*, 334 Ga. App. 728, 731 (2) (780 SE2d 397) (2015). After a thorough review of the record, we conclude that the trial court did not abuse its discretion in limiting Dr. Tillitski's testimony here.

At trial, Hambrick presented Dr. Tillitski's testimony to criticize the forensic interview technique. Dr. Tillitski, who is a psychologist, stated that he reviewed certain documents to form his opinion regarding the circumstances of the disclosure, including the police report. He then proceeded to mention information from the police report that he had considered in reaching his opinion, and the State objected on hearsay grounds. After a lengthy discussion with trial counsel, the trial court permitted Dr. Tillitski to testify about the forensic interview process, but not the contents of the police report. Trial counsel then sought to elicit testimony that the manner of the outcry was consistent with a risk of fabrication, much like the State's witness testified that the forensic interview was consistent with abuse.

Notably, the record reflects confusion over exactly what trial counsel was trying to elicit from the expert. The trial court repeatedly stated that it would not

17

allow the expert to act as "a lie detector," and trial counsel explained that she was trying to establish what an interviewer should look for to determine if an allegation was fabricated or tainted. Trial counsel argued that the State's witnesses had been allowed to testify based on hearsay, but the trial court disagreed and noted that the other witnesses testified from their personal observations, whereas this expert was testifying based on what he read in a police report. Counsel then explained that she was trying to ask the expert whether the outcry had characteristics that raised red flags, not whether D. H. was telling the truth. And, although the State objected on the ground that the witness was only an expert in forensic interviews and not case analysis, the trial court allowed the expert to testify about the types of outcry that were less likely to be the result of a scripted or fabricated memory. The trial court ultimately allowed Dr. Tillitski to testify about the circumstances of the disclosure, but not about the facts he had obtained from the police report.[8] Dr. Tillitski then testified about scripted memories and spontaneous outcry and whether, in his opinion, D. H.'s disclosure could have been scripted.

---

[8] Dr. Tillitski testified that he had concerns about the forensic interview process because the family had been "leery" of Hambrick for some time. The State objected to this testimony as based on hearsay and as inconsistent with the testimony in the record.

A review of the record confirms that the trial court did not abuse its discretion by limiting Dr. Tillitski's testimony. The trial court allowed the expert to testify at length about the forensic interview and what he opined were problems with the process, as well as why certain outcries were more likely to be the result of a scripted response. See OCGA § 24-7-707 ("In criminal proceedings, the opinions of experts on any question of science, skill, trade, or like questions shall always be admissible; and such opinions may be given on the facts as proved by other witnesses."); OCGA § 24-7-704 (a) (expert may give opinion that goes to the ultimate issue in the case). Moreover, Dr. Tillitski was permitted to rely on the police report to form his opinions. See *Smith v. State*, 2019 WL 5301773, __ Ga. __ (6) (834 SE2d 750, 759-761 (6)) (2019); see also *Lupoe v. State*, 300 Ga. 233, 244 (4) (794 SE2d 67) (2016) (experts may sometimes rely on and testify about otherwise inadmissible hearsay regarding their opinions); *Davis v. State*, 299 Ga. 180, 187 (2) (a) (2) (787 SE2d 221) (2016) (recognizing that an expert may listen to the testimony at trial and use that information to form the basis of his opinions).

What the trial court prohibited was the expert's testimony about the *contents* of the police reports. None of our rules of evidence directly allow such testimony. See OCGA § 24-7-703 (expert may rely on inadmissible evidence in forming opinion, but

19

generally may not testify to the content of the inadmissible evidence). In fact, trial counsel conceded that the trial court could "limit [the expert] from going into specific things of the police report." That is precisely what the trial court did.[9]

To the extent that Hambrick contends that the State's witnesses were not limited in the same manner, his argument is without merit. As the trial court noted, the State's witnesses testified as to their own personal knowledge and not based on hearsay information from another source. Moreover, Dr. Tillitski was permitted to testify extensively as to his opinion regarding problems with the forensic interview and reasons why, in his opinion, D. H.'s outcry could have been fabricated. *Rayner v. State*, 307 Ga. App. 861, 864-865 (2) (706 SE2d 205) (2011) (expert could testify to the propriety of the interview techniques, but not about a witness's believability). The only limitation the trial court placed on the witness's testimony was to exclude testimony about the contents of the police report on which he relied in forming his

---

[9] We note that the State argued at times that the expert could not base his opinion on hearsay evidence or give an opinion that related to the ultimate issue in the case. In this respect, the State was incorrect. See OCGA §§ 24-7-703; 24-7-704. But the record reflects that the trial court was concerned that the expert was commenting on D. H.'s truthfulness, which was inappropriate, and that it agreed that the expert could testify as to the types of outcries and the risk of a scripted response or fabrication.

opinion. Accordingly, the trial court did not abuse its discretion in limiting Dr. Tillitski's testimony, and we find this enumeration to be without merit.

4. Hambrick also contends that the trial court plainly erred in allowing the mother and great-grandmother to testify that there was a DNA test confirming Hambrick was D. H.'s father because such testimony was hearsay. He asserts that, in the absence of DNA results, the State did not prove consanguinity for purposes of the incest charge. This argument is misplaced.

Hambrick did not object to the testimony at trial, and therefore we review for plain error. OCGA § 24-1-103 (a), (d). See also *Pierce v. State*, 302 Ga. 389, 393-394 (1) (c) (807 SE2d 425) (2017).

> To establish plain error, Hambrick must show
>
> an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error—discretion which ought to be exercised only if the error seriously

21

affects the fairness, integrity or public reputation of judicial proceedings.

(Punctuation and emphasis omitted.) *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011). Hambrick has not met his burden.

At the motion for new trial hearing, trial counsel testified that she understood Hambrick to be the child's father and that Hambrick never informed her otherwise. Thus, the theory of defense was not a lack of consanguinity, but rather that the acts never happened at all.

In any event, although both the mother and great-grandmother testified that there was a DNA test confirming Hambrick was D. H.'s father, and no DNA test was ever admitted, this testimony was harmless. Under OCGA § 16-6-22 (a), "[a] person commits the offense of incest when such person engages in sexual intercourse or sodomy, . . . with a person whom he or she knows he or she *is related to either by blood or by marriage* as follows: (1) Father and child or stepchild[.]" (emphasis supplied). The undisputed evidence was that Hambrick and D. H.'s mother were married at the time of the abuse. Therefore, Hambrick was related to D. H. by marriage regardless of whether he was related to D. H. by blood, and there was no need to admit any DNA evidence to establish incest. As such, an error in admitting

22

this hearsay evidence did not affect Hambrick's substantial rights, and he fails to show plain error.

5. In his next enumeration of error, Hambrick contends that the evidence was insufficient to prove venue with respect to the rape, incest, and cruelty to children counts because those acts allegedly occurred in Vine City, and there was no testimony to show that Vine City was in Fulton County. We disagree.

> As a general rule, our Constitution provides that a criminal case must be tried in the county where the crime was committed, and when venue is in issue, it is a jurisdictional fact that must be proved by the State beyond a reasonable doubt. Even so, venue generally is a question for the jury, and on direct appeal, the evidence must be viewed in the light most favorable to the verdict of the jury, and the verdict must be sustained as to venue so long as the evidence would permit a rational jury to find beyond a reasonable doubt that venue was properly laid.

(Citations, punctuation, and footnotes omitted). *Martin v. McLaughlin*, 298 Ga. 44, 45-46 (779 SE2d 294) (2015); see also Ga. Const. of 1983, Art. VI, Sec. II, Par. VI.

As Hambrick concedes, there was sufficient evidence to establish that the grandfather's house in Alpharetta was in Fulton County. D. H.'s testimony established that the abuse underlying the rape, incest, and cruelty to children charges

23

happened at the grandfather's house more than once. Viewing the evidence in the light most favorable to the verdict, this testimony was sufficient for the jury to conclude that the State established the crimes occurred in Fulton County.

6. Hambrick next argues that the trial court erred in failing to merge the rape conviction with the cruelty to children conviction because the two counts required the same evidence. We discern no error.

> Under OCGA § 16-1-7 (a) (1), an accused may not be convicted of more than one crime if one crime is included in the other. A crime is considered to be included in the other if it is established by proof of the same or less than all the facts than is required to establish the commission of the crime charged. In considering whether crimes merge under that standard, we apply the "required evidence" test, which considers whether each statute requires proof of an additional fact that the other does not.

(Citations and punctuation omitted.) *Tinson v. State*, 337 Ga. App. 83, 86 (2) (785 SE2d 914) (2016); see also *Drinkard v. Walker*, 281 Ga. 211, 214-217 (636 SE2d 530) (2006). "The 'required evidence' test applies strictly within the context of determining whether multiple convictions are precluded because one of the crimes was 'established by proof of the same or less than all the facts' that were required to establish the other crime under OCGA § 16-1-6 (1)." *Ledford v. State*, 289 Ga. 70, 73

24

(1) (709 SE2d 239) (2011), overruled on other grounds by *Willis v. State*, 304 Ga. 686, 706, n.3 (820 SE2d 640) (2018).

To convict Hambrick of rape, as charged in the indictment, the State had to prove that he "has carnal knowledge of: [a] female who is less than ten years of age. Carnal knowledge in rape occurs when there is any penetration of the female sex organ by the male sex organ." OCGA § 16-6-1 (a) (2).

To convict Hambrick of cruelty to children, as charged in the indictment, the State had to prove that he "maliciously cause[d] a child under the age of 18 cruel or excessive physical or mental pain" by having sexual intercourse with her. OCGA § 16-5-70 (b). To prove this count, the State presented evidence that Hambrick used tape to silence D. H. when she cried during the abuse, and that he caused injury and scarring to her anus that made going to the bathroom painful.

Upon review, we conclude that the trial court properly declined to merge these two offenses. See *Pendley v. State*, 308 Ga. App. 821, 826 (4) (709 SE2d 18) (2011) (under required evidence test, rape conviction did not merge into cruelty to children conviction because each required evidence of a fact the other did not); *Currington v. State*, 270 Ga. App. 381, 385 (2) (606 SE2d 619) (2004) (cruelty to child conviction and rape conviction did not merge as a matter of fact); *Ranalli v. State*, 197 Ga. App.

25

360, 363-364 (2) (b) (398 SE2d 420) (1990) (lesser offense of cruelty to children based on rape did not merge into greater offense of rape because the elements of excessive physical and mental pain were not elements of rape).[10]

Moreover, there was testimony that Hambrick abused D. H. on more than one occasion, and thus the jury could have found that the two counts were based on separate instances. As such, the two charges would not merge. See *Jones v. State*, 335 Ga. App. 591, 596-597 (2) (782 SE2d 489) (2016).

7. Finally, Hambrick urges this Court to remand for resentencing because the trial court's oral pronouncement conflicts with its written sentencing order in that it imposed a split sentence only on the incest count. The State concedes that the trial court erred in calculating the total sentence, as it should read 219 years to serve with life on probation.

When the trial court resentenced Hambrick to include a split sentence as required under OCGA § 17-10-6.2, the sentence imposed was 219 years' imprisonment with life on probation. The written judgment indicated that Hambrick was sentenced to 220 years to serve.

---

[10] Although the decisions in *Currington* and *Ranalli* pre-date the *Drinkard* standard, the result would be the same because, in each case, there were elements of the crimes that did not overlap.

As the State concedes, the trial court's written order incorrectly identifies the total sentence imposed. Accordingly, we remand the sentence for the trial court to correct this scrivener's error.

For the foregoing reasons, we affirm the denial of Hambrick's motion for new trial, but remand the sentence to correct a scrivener's error.

*Judgment affirmed in part and case remanded in part. Doyle, P. J., and Coomer, J., concur.*